Willetts *v.* Buffalo and Rochester Railroad Co.

———————•◦•◦•———————

WILLETTS, adm'r, &c. *vs.* THE BUFFALO AND ROCHESTER RAILROAD COMPANY.

A lunatic was traveling in the cars, upon a railroad, in company with his father, who had paid the fare of both, through, and taken tickets. The father got out at a stopping place, to procure refreshments, leaving his son in the cars, without giving notice to any one of his situation; and while absent the train started. On regaining the cars the father did not find his son where he had left him, the latter having changed his seat. The conductor, in the absence of the father, applied to the lunatic for his ticket, not knowing him to be insane, or that his fare had been paid. The lunatic refusing to deliver his ticket, the conductor caused the train to be stopped, and the lunatic to be put off the cars; in consequence of which the lunatic was run over by another train of cars, and killed. The evidence not showing any negligence, or want of care, on the part of the conductor, but showing great negligence and imprudence in the conduct of the lunatic and his father; *Held,* that an action could not be maintained by the personal representative of the lunatic, against the railroad company, to recover damages, under the act of December 13, 1847.

MOTION for a new trial upon a case. The action was tried at the Erie circuit in June, 1852, before Justice ALLEN.

The plaintiff was the administrator of Washington Willetts, deceased. The action was brought by the plaintiff, pursuant to the act of 1847, authorizing an action, to recover damages, to be maintained by the personal representatives of any person whose death shall be caused by the wrongful act, neglect, or default of another. (*Laws of* 1847, *p.* 575.) The deceased was near thirty years old, and had been a lunatic for six or seven years. His father resided in Michigan, and was taking his son home

VOL. XIV. 74

from the insane asylum at Utica, where he had been some nine months. He paid their fare at Utica through to Buffalo, and took joint tickets for two persons. At Attica he left the car to procure some refreshments, leaving his son in the car. The train started, and the father had some difficulty in reaching the cars. He immediately passed through the rear car and looked out to see if his son had been left at Attica. Not seeing him, he passed through all the cars, seven, looking for him; and not finding him, he concluded that he must have been left behind, and he took the seat which they had occupied, in the forward car, intending to go on to Buffalo and return with the first cars to Attica for his son. Not long after, the conductor called upon him for his ticket, and the father then inquired for the young man that had been sitting with him. The conductor informed him that he called upon him for his ticket, that he said nothing; that he, the conductor, inquired of him where he was going, and that he said nothing; and he stopped the train and put him off at Alden. Mr. Willetts, the father, then informed the conductor that the young man was his son, and that he was crazy, and requested that the cars be stopped that he might leave in search of his son. The conductor told him a car would be going east soon and he would put him in that, and he could go to Alden. Mr. Willetts soon took the car going east and went to Alden, eleven miles west of Attica. Not seeing or hearing any thing of his son, it being now near dark, he started westwardly upon the railroad and traveled rapidly some five miles, to a place where some of the trains stopped. Not finding his son he concluded to return to Attica, under the impression that he must have been left there. A baggage train came along, and he communicated to the engineer the circumstances, and that he thought he must have got off at Attica. He was taken upon the engine, and desired to sit so that he could see forward, but was told that he would be in the way in the place he desired, and was directed to another place where he could not see the track. It was star light. They started, and proceeded about a mile, when an exclamation was made by the engineer, the whistle sounded and the engine was reversed and stopped, and the deceased was under the car, having received

Willetts *v.* Buffalo and Rochester Railroad Co.

injuries which caused his death the next day. It further appeared, from the testimony of a witness who assisted in putting the deceased off the car, at the instance of the conductor, that the conductor called upon him for his ticket, that the deceased handed the conductor a card of a public house; that the conductor told him that was not his ticket, and insisted on his paying, or he should put him off the car. The conductor soon spoke to the witness, saying he had a man to put off, and wanted witness to assist, as he was lame. The witness went to the deceased, put his hand on his shoulder and asked him why he did not pay his fare or give the conductor his ticket; the deceased felt in his pocket and got another hotel ticket and handed it to the witness. Witness told him that was not the ticket. The cars at this time were nearly stopped. The witness then lifted the deceased with one hand, and he got up and was conducted to the door, when he put out one hand to brace himself against the side of the door. Witness told him not to resist, and he dropped his hand and stepped down upon the second step of the platform and said Judge Miller had paid his fare or would pay it, and then stepped down onto the ground, and the conductor gave the signal to proceed. The witness said, he recollected that as the deceased looked up from the ground he had a sort of wild, scared look about his eyes, and that he inquired of the conductor, is there any thing the matter with that man? and that the conductor replied that he was one of the stubborn kind. The deceased was put off about a mile east of Alden. The train was then running express, and did not stop at Alden.

It further appeared from the evidence of his father, that the deceased had been a lunatic for six or seven years, and that during that time he labored for his father, except one year when he was absent. A part of the time he worked by the month; that he had the appearance of a sane man, save his eyes which had a sort of wild stare. That in coming from Utica he assisted his father in looking after the baggage, and helped him on and off the train, and other similar acts. Another witness had known the deceased twelve or thirteen years before he went to the asylum. He testified that the deceased worked for

his father on the farm and in the tannery; that he was insane upon the subject of religion, but upon other subjects apparently sane, unless irritated or excited; that a stranger, he thought, would at once observe a wildness about his eyes, and a foolish smile upon his countenance; that he appeared to be careful and skillful in taking care of himself.

The plaintiff was nonsuited, and now moved to set aside the nonsuit, and for a new trial.

*I. T. Williams,* for the plaintiff, referred to *Sess. Laws of* 1847, *p.* 575; *Id.* 1849, *p.* 388; 14 *John. R.* 304; *Angell on Com. Car.* §§ 27, 51, *and cases there cited;* 6 *Bing.* 716; 13 *Pet.* 190; 2 *Eng. L. & Eq. Rep.* 360.

*J. O. Putnam,* for the defendants, referred to *Sess. Laws of* 1850, *p.* 231, § 35; 7 *Met.* 596; 2 *Sumn.* 221; 21 *Wend.* 615, 620; *Sess. Laws of* 1850, *p.* 234, § 44; 8 *Barb.* 368; 2 *Taunt.* 314; 23 *Wend.* 435; 21 *Id.* 342; 2 *Met.* 216; *Sedg. on Damages,* 90, 91, 92, 93.

*By the Court,* MARVIN, J. If the death of Washington Willetts was caused by the wrongful act, neglect or default of the defendants or their agents, under such circumstances as would have entitled him, if living, to maintain an action and recover damages for the injury, then this action is maintainable by his administrator. (*Sess. Laws of* 1847, *p.* 575.)

It is clear, upon general principles, and upon the assumption that the deceased was sane, that the action cannot be maintained. The evidence does not show any negligence or want of care on the part of the agent of the defendants at the time the injury happened, but it shows great negligence and imprudence by the deceased. I am now assuming him to have been sane. Under such circumstances no action will lie. Had negligence on the part of the defendants' agent been shown, the negligence and imprudence of the deceased would have prevented his sustaining any action. The defendants were engaged in their lawful pursuits, in a lawful and proper manner, upon their own possessions or road, and the deceased was carelessly and unlawfully upon

Willetts *v.* Buffalo and Rochester Railroad Co.

the road.    It can hardly be necessary to cite authorities to show that when the plaintiff has materially contributed, by his own negligence or by his own wrongful act, to the production of the injury, he cannot recover in an action founded upon the negligence of the defendant.    And in this view it is not material whether the act of putting the deceased off the car, was justifiable or not.    The act was too remote and disconnected from the act occasioning the injury.    It occurred some hours before, and at a place some five miles distant.    The calamity was occasioned by the negligence of the deceased.

But the deceased was not sane; and we are to consider the case with that fact in it.    In this view it may be material to inquire whether his removal from the car was justifiable; and whether the rule touching the negligence of the injured party is properly applicable to the case.

If the deceased was removed from the car with full knowledge of his insanity, and left upon the road exposed to danger, it would not be unreasonable to hold the defendants liable for such gross act of negligence, for any injury that might happen to him, before his committee or protector had notice and an opportunity to take care of him.    Had the conductor any notice of the insanity of the deceased?    The acts of the conductor, and the attending circumstances, are minutely stated by a witness, who, under the direction of the conductor, removed the deceased from the car.    The evidence does not tend to establish the fact that the conductor had notice of or suspected any insanity.    The fact that the deceased, when applied to for his ticket, produced and offered a hotel card, cannot be regarded as evidence of insanity.    No part of his conduct furnished sufficient evidence of insanity to put the conductor upon his guard.    Neither the conductor nor the witness had any suspicions of insanity, or that any thing was wrong with the deceased, until he was removed from the car, and then the witness recollects as he looked up he had a sort of wild, scared look, about his eyes.    It does not appear that he communicated this to the conductor, but he asked if there was any thing the matter with the man, and the conductor remarked that he was one of the stubborn kind.    The father of

the deceased states that he had the appearance of a sane man save his eyes, which had a sort of wild stare. No notice had been given to the conductor, or in the cars, so far as we learn from the case. It seems to me the evidence falls far short of notice to the conductor.

It is, however, argued that as the fare of the deceased had been paid to Buffalo, the act of the conductor cannot be justified. Our attention has been directed to a provision in the general railroad act of 1850, (*Sess. Laws, p.* 231, § 35,) which makes it lawful for a conductor, if a passenger refuses to pay his fare, to put him and his baggage out of the cars. Here the fare was in fact paid at Utica, and double tickets obtained through to Buffalo. The fare was not paid to the conductor who removed the deceased, and he had no notice that the fare had been paid. Is it not the duty of the passenger, when called upon by the conductor, to exhibit the evidence of the payment of fare, or at least to give notice that his fare has been paid? May he remain silent, leaving the conductor to understand that the fare has not been paid, and when expelled from the cars, maintain an action by showing that in fact he had paid his fare to some other agent, at a place hundreds of miles distant? Such a rule would operate as a snare. Can it be maintained that the company and its agents are bound to know whether the particular individual has paid his fare? This, under our present mode of traveling, would be impossible. A train of cars often contains many hundred passengers, who seat themselves in the cars promiscuously and to suit their convenience. It is utterly impossible for any conductor to recognize and distinguish each individual, though the fare may have been paid some time previously to himself. But the fare is not usually paid to the conductor, but, as in the present case, to an agent at the office, who delivers to the passenger the number of tickets paid for. It is necessary that carriers in steamboats, and cars upon railroads, should establish reasonable rules for the transaction of their business, and for the convenience of travelers, and they do establish rules and regulations, and it is the duty of the passenger, when apprised of them, to conform to them, in a reasonable manner.

They are the terms upon which he applies for and obtains a passage, and may be regarded as an element in the contract between the carrier and the passenger.  These regulations should be reasonable.  It is the duty of common carriers of passengers to convey passengers, and they should not make unreasonable rules, that would be likely to exclude them or prevent their taking passage. An innkeeper is bound to entertain his guest, but he may refuse to receive one who conducts himself in a noisy and disorderly manner, and he may under such circumstances, compel him to leave the inn after he has been received as a guest.  (*Story on Bailment*, § 476.)  Suppose a passenger in the cars having paid his fare, conducts himself in a disorderly, noisy and disgraceful manner, to the great annoyance of the other passengers, may not the conductor, if he refuses to desist, expel him from the cars?  Would it not be his duty to do so?  (*See Commonwealth* v. *Powers*, 7 *Met.* 601.)

The conductor should have been notified that the fare had been paid.  No notice was given, and from what actually occurred, he had good reason to suppose that the deceased was trifling with him.  In the *Commonwealth* v. *Powers*, above cited, one Hall, an innkeeper, had been in the habit of entering the depot of a railroad company and going to the cars to solicit passengers, to their annoyance, and the company had established regulations prohibiting this practice, of which Hall had notice. He however had continued the practice, against remonstrances, and was finally forbidden to enter the depot.  A day or two after, he procured a ticket, for a passage in the cars, and came into the depot and was advancing to the cars, when the master of the depot forbid his proceeding and desired him to leave the depot; and upon his persisting to advance, laid hands upon him and expelled him.  Hall complained of this act as an assault and battery.  He did not give any notice that he had paid fare, or that he desired to take passage in the cars.  It was held that the regulation was reasonable and proper; that the master of the depot had a right to enforce it and remove Hall; and that his having paid fare and obtained a ticket, with the *bona fide* intention of going in the cars as a passenger, which

facts were unknown to the master of the depot, did not make the master liable; that to put the master in the wrong, Hall should have communicated to him the facts. This case is in point.

In the present case we are to keep in mind that the passenger was insane, and we may suppose incapable of giving notice; and how does this affect the case? As we have seen, the conductor had no notice of the insanity. Must it be held that he acted at his peril? This would be to hold him or his principals responsible though his conduct may have been characterized by the utmost prudence and caution. The general rule requires care—the absence of negligence—in the party complaining. Infants and lunatics may be incapable of exercising care, and in such cases other parties, having notice, may be held to a stricter responsibility for their negligence; but without notice, upon what principle can the general rule be departed from? All persons incapable of diligence should, and usually have, guardians to care for them: upon them the duty of care and diligence is devolved, and their negligence must, in law, be regarded as the negligence of the incapable infant or lunatic when they have been injured, in cases arising between them and third persons acting without notice.

In *Hartfield* v. *Roper*, (21 *Wend.* 615,) the action was by an infant two years old. He was in the sleigh path alone, and was run over and injured. It was held that no action would lie, if the injury was not voluntary or from culpable negligence. The rule of negligence was applied to the case, and the want of care, on the part of the child's parents, was regarded as a want of care on his part. Justice Cowen supposes the case of a lunatic, suffered to stray by his committee, lying in the road and being struck by a traveler's sleigh, and says the neglect of the committee to whom his custody is confided shall be imputed to him. He also laid down the rule that if an infant insists upon a right of action, he must show a compliance with the conditions upon which his right depends. The reasoning of the court in *Hartfield* v. *Roper*, is applicable to the present case. The deceased was in charge of his father, his natural guardian and protector. His father imprudently and negligently left him in the cars at Attica, without notice to any one of his condition.

Willetts *v.* Buffalo and Rochester Railroad Co.

The lunatic changed his seat from the car where he was left, to another car. His father returning to the cars, failing to find him, seats himself with the intention of proceeding to Buffalo and then returning, instead of immediately communicating with the conductor and requesting permission to leave the cars. It would seem that he was not seriously alarmed, and perhaps from the description given of the deceased, there was no serious cause for alarm, as he is described as being careful of himself and skillful in taking care of himself. The cars proceeded ten miles, when they were stopped, not at a station, and the deceased was put off. The father must have noticed the stopping of the cars, and it is somewhat strange that he should not have ascertained the cause, having an insane son in charge who, he supposed had been left at Attica, but might still be, as he was, in the cars. Had he been diligent upon that occasion, the calamity would not have happened. He had left his son without the evidence of the payment of fare. It was negligence in him not to be with his son when the tickets were demanded. But the prominent act of negligence was leaving him, in the cars, under the charge of no one, and without notice, exposed to any and all danger that might arise from his condition. Doubtless the father was kind and generally considerate, and on this occasion supposed no evil would happen. His son was most unfortunately removed from the cars, through his negligence, the calamity followed; and however afflicting it has been, the responsibility cannot be thrown upon the defendants.

The plaintiff, as administrator, cannot maintain this action, unless Washington Willetts, had he survived the injury, could have maintained it. (*Sess. Laws,* 1847, *p.* 275.) The same rules are therefore to be applied in considering the case, as would have been applied, had he survived and brought the action. In any view that can be taken of the case, in my opinion, the action cannot be maintained. The nonsuit was properly granted. It was not a case for the jury. (*Hartfield* v. *Roper,* 21 *Wend.* 623. *Tonawanda Railroad Co.* v. *Munger,* 5 *Denio,* 255.

The motion for a new trial must be denied.

[NIAGARA GENERAL TERM, February 7, 1853. *Taggart, Marvin* and *Mullett,* Justices.]