NEW YORK PRACTICE REPORTS.        407

Gonzales agt. N. Y. & Harlem R.R. Co.

## COURT OF APPEALS.

ELIZABETH GONZALES, administratrix, &c., of JOHN H. GONZALES, deceased, appellant, agt. THE NEW YORK AND HARLEM RAILROAD COMPANY, respondent.

A *railroad company* owes the duty to its *passengers* of making and maintaining, at all times, a suitable and safe track for its road; of furnishing comfortable and safe cars; of running its trains regularly and safely ; of so adjusting its time-tables and the passage of its trains that no injury will be likely to be caused thereby; and it is its duty to furnish safe and ready passage way to and from its cars, on either side thereof, and between them and its station buildings, when no notice to the contrary is given, *and in all this to exercise the highest degree of skill and care.*

Its engineers. conductors, and other employees engaged on the trains and in employments directly connected therewith, are bound to know the times when trains are liable to meet, or to pass each other, or to pass stations; and the duty is devolved upon them, if trains are out of time, to be on the look out and give seasonable notice to each other of any meeting of trains out of time or place, so that accidents and injury to life or property may be avoided; *and in regard to this also they are bound to exercise the utmost care and diligence.*

It is *gross negligence* in the company so to arrange its time-table that within one minute from the time of passing an accommodation passenger train from a station, another train running at the rate of thirty or more miles an hour should pass the same point.

It is also negligence in permitting an express train, when it is perceived from it that an accommodation train is at a station going in an opposite direction, to continue on and pass the station at its usual rate of speed; and it is the duty of its conductor or engineer, under such circumstances, to slack its speed or to stop before reaching the station.

The omission of the express train, in such case, to ring the bell or to sound the whistle when passing the station, is also negligence.

So, too, it is the duty of the conductor of the accommodation train, in such case, and of the engineer, to know whether that train is out of time ; and whether it is probable that the express train will pass the station while their train is there; and it is their duty, under the circumstances, to look out for the express train, and to signal if it is near; and it is also their duty to see that the passengers should be prevented from leaving the train on the side next to the track of the express train, or at least to give them notice of the approaching train, and to request them either to sit still until that train has passed, or to leave the train on the other side, *and the omission to do so is negligence.*

While a court can nonsuit a party in an action like this, where, by the proof, it is palpable or patent that he is negligent, it has no right to draw inferences of fact

to be derived from the facts and circumstances proven, unfavorable to the plaintiff, and upon such inferences to decide the case. It is the province of the jury to determine what are the inferences of fact to be deduced from the testimony, to the same extent that it is to decide the facts when the evidence is conflicting.

In regard to all the obligations which a railroad company assume towards a passenger, including all which are above stated, the presumption of law is that the company will properly discharge all of them, and that the passenger has a right to rely upon and govern his own action accordingly, unless he is informed or notified to the contrary.

Even if the deceased in this case, knew the time fixed for the passing of the two trains, he had a right to rely that there would be no danger in his getting off as he did, and passing on the crossing to the west side of the railroad, it being the duty of the conductor of his train to observe the true railroad time and to give warning of anything uncommon, from which danger was to be feared.

It was not negligence in the deceased, in assuming that the express train would sound its whistle before reaching the station, as was its usual custom; and as upon the proof, no bell was rung or whistle sounded, he was not negligent in assuming that the express train had not arrived and would not until long after he could get across the road. The getting off the train on the west side was not negligence *per se*.

It is the duty of railroad companies, at all times, so to adjust their business as to make it safe for passengers (including those who are partially disabled in sight, hearing, limbs, or physical strength), on the arrival and stoppage of a train, to pass between it and the depot. And that when, from any unforeseen contingency, it is not safe, it is the duty of its employees to know it and take proper precautions to prevent the passengers from exposing themselves to the danger That the passengers have a right to assume that it is safe for them to do so until notified to the contrary and to act accordingly.

That the court below erred in nonsuiting the plaintiff, but should have submitted it to the jury, and that the evidence would have warranted a verdict for the plaintiff.

*March Term,* 1870.

THIS action was brought in the superior court of the city of New York, to recover damages sustained by the death of John H. Gonzales, who was killed on the defendant's railroad, immediately after leaving the car on which he was a passenger. The only material issues were whether there was negligence on the part of the defendant or its servants which caused the death, and if so, whether there was also negligence of the deceased which contributed to it.

The cause was tried before a jury, and after the testimony was closed the counsel for defendant " moved to dismiss the complaint, on the ground that from the evidence, as it stood, it appeared that the deceased had alighted from the train at a place different from that provided for the

landing of passengers and had got on the track of the railroad when the express train must have been so near as by the exercise of ordinary caution, looking, he could have seen it." The court granted the motion, and the plaintiff's counsel excepted. The court thereupon ordered that the complaint be dismissed and that the exceptions be heard in the first instance at the general term of the court. The general term affirmed the order dismissing the complaint, and gave judgment for the defendant, and the plaintiff appealed to this court.

The material facts bearing on these questions are stated in the opinion.

R. W. Van Pelt, *for appellant.*

Charles A. Rapallo, *for respondent.*

Foster, J.—We must assume that in dismissing the complaint, the court did so upon the assumption where there was conflict or difference in the testimony in reference to any fact, that the version most favorable to the plaintiff was the true one, and that it did so as well in cases where the witnesses for the plaintiff differed in their statements, as where conflict arose between the proof on the part of the plaintiff and that of the defendant, for in either event the question of reconciling or determining such conflict or variance in the testimony belongs exclusively to the jury, and a determination of the fact when made by the court cannot stand, unless his ruling is in accordance with that most favorable to the party against whom he decides it. Any other principle than this, if applied to such cases would virtually deprive a party of a trial by jury, which the constitution guarantees to him. The question with this court therefore is, whether the determination of this action made by the court below can be maintained upon the testimony most favorable to the plaintiff.

The case having been before this court upon an appeal

from a judgment rendered for the plaintiff upon a verdict on a former trial, and a new trial having been granted, it is contended for the defendant "that it has been decided by this court. That the last trial has not materially changed the facts on which that decision was made, and that the only additional evidence is that of the witness *Seibold* as to the defect in the sight of the deceased, and that of *Lavinski* as to the brakeman calling out 'all out for Mount Vernon.'"

If this court has decided this case upon substantially the same evidence, the question is *res judicata*, and should determine the action for the defendant now. It becomes necessary, therefore, to ascertain what the material testimony was on the former trial, and what is the difference between that and the evidence which was given on the recent trial. The statement of the facts upon which this court granted the new trial, (38 *N. Y.*, 440–442,) is as follows: "The casualty occurred at West Mount Vernon station, on the defendant's road, November 15, 1864; the deceased was a passenger by the accommodation train from New York city, where he did business, to West Mount Vernon where he resided. The train by which he was a passenger was *due* at the latter place at 3.27 P. M., and a down express train, passing that station without stopping, was due there one minute later. The defendants track was double at this point, the express train passing down on the west track and the accommodation train passing up and stopping on the east track. The station house was on the west side of the tracks, but there was a platform, 185 feet long, on the east side of the tracks, against which the accommodation train was accustomed to stop. A street or highway crossed the tracks of the railroad, twenty-five feet south from the south end of this platform, and the house of the deceased was situate on the south side of this street, a short distance west of the crossing and in sight of it. On the day of his death, the deceased alighted from one of the intermediate cars of the train by the rear platform, at or south of the street

crossing, and on the west side of the up track, or between the two tracks; at the instant of his coming to the ground the express train passed down on the west track, and he fell under the wheels of the train from which he had alighted, was dragged a short distance north and was killed, his body when extricated being near the north line of the street crossing. There was some conflict of evidence as to whether the accommodation train had stopped when the deceased got off. Several witnesses testified that it stopped for an instant when the deceased alighted, but moved on again immediately. It had not reached its usual stopping place, but was moving up to the platform when the deceased fell under the wheels. The tracks were straight and the view unobstructed for a distance of 500 feet from the place where the deceased got off. Several witnesses on the part of the plaintiff testified that they heard no bell rung or whistle sounded by the express train, while the engineer of that train testified that he sounded the whistle to 'down brakes,' about eight hundred feet north of the scene of the accident, and that the fireman rang the bell as they came down to and passed the station, and a brakeman who was on the rear platform of the up train, testified that he heard the whistle, and leaning over saw the down train approaching before it reached the up train. The deceased was frequently a passenger by the same train, and it was shown under objection of the defendant that he and other passengers were in the habit of getting off on the west side of the cars. It was not proved whether the deceased was struck by the down train, or whether in stepping back from it, he fell near the wheels of the other. The injuries which produced his death were inflicted by the wheels of the up train, and there was no injury attributable to a blow from the down train."

The court in granting a new trial in this case, may have been right, and that upon the evidence the judge would have been warranted in granting the non-suit which was

moved for, and, perhaps, also though, I think it questionable, should have held that the failure of the deceased to look up and down the railroad, before attempting to cross it, was such negligence as would relieve the defendants liability. But if the court intended under any and all circumstances, it was *such negligence* for a person to cross a railroad track, without taking the precaution to look up and down the track, the *holding is in conflict* with several decisions of the court, and while it may be the rule of this case upon the like evidence, it does not become the rule for more than that, so as to preclude discussion. I do not think the court can have intended to lay down such rule, and Dwight, J., in his opinion, goes no further than to say, "that it was the duty of the deceased to look in the direction from which the express train was *due*, before attempting to cross the track, and that if he omitted to do so, he was guilty of negligence, which precluded a recovery." I think he must have taken it for granted, that the deceased knew it was then due; and he must be deemed to have meant only that his omission upon the facts found constituted the negligence.

The testimony now, differs from the proof on the former trial, by that now given, "that the sight of the deceased was impaired, and his eyes at times, quite sore so that he could see only about ninety or one hundred feet," and that the brakeman immediately before the deceased left the car, called out, "*all out for Mount Vernon*," but also, in very many other particulars. It was proved on the last trial that the deceased who resided on the west side of the railroad, as before stated, was a sober and industrious man, and carried on the gunsmith business in the city of New York. That his habit was to leave his house for New York city, in the early morning train, leaving at about half past six o'clock; that in returning home, "he always took the last train, the 6.40 train, and that this was his uniform rule. That on the 15th of November, (the day in

question,) his wife was unwell, and he returned from New York by the train in question. That the train made its full stop at the usual place, and the brakeman gave the call for the passengers to get out; that the train was up to the station; that at the same stopping, the passengers who were to take that train going north, got aboard; that no other stop was thereafter made with that train, until the alarm was given that a man was under it; and that that stop was as usual. That the end of the car at which the deceased got off, and which he did after the call by the brakeman, and after the full stop, was where the plank walk was laid across the railroad on the north side of the street which crossed it, and that he left the train at the same time that the other passengers did; that immediately after he reached the ground he was struck by the cross-piece of the engine of the express train, and thrown toward the up train, and the advance of the express train prevented the witness who testified to it, (and who was standing in a southwesterly direction from that point,) from seeing where he was thrown to; and the next that was seen of him, he was under the train on which he had been a passenger; that he was wounded on the right temple, on his right side at which place some of his ribs were broken, and his legs were cut off. The testimony, and without contradiction, showed that no whistle was sounded or bell rung, on board the express train, until after the accident. That the platform which was on the east side of the railroad, was placed there at a time when the passenger station and depot were on that side of the railroad track, and that afterwards, the station and depot buildings were built on the west side of the road, and a platform was then built on the side where the station then was, the old one being continued on the east side, and used for up train passengers. The time-table which was given in evidence, showed that the time appointed for the up train to *leave* that station, was 3.27 p.m. and that the time for the express train to *pass*, was 3.28

p.m., but how long *that* time-table had been adopted did not appear.

It also appears from the testimony of the superintendent of the railroad, in answer to the question, whether there was any regulation or notice on the part of the company, in regard to the up train passengers using the east platform, and to the down train passengers using the western one, answered that, "the regulation is the providing of platforms for the up and down trains," that there is no printed notice or actual notice given. It also appeared from the testimony of a witness, who got off from the easterly side of the same end of the car that the deceased did and at the same time, that there was no platform there on the east side, but that it was in the street crossing.

The analogy between this case when previously before this court, and the cases of *Ernst* agt. *The Hudson R. R. R. Co.*, (36 *How.*, 84;) *and Wilcox* agt. *The Rome & Watertown R. R. Co.*, (39 *N. Y.*, 358,) cited by DWIGHT, J., in his opinion in this case, was far from complete. In both of those cases, as also in the case of *Beisiegel* agt. *The N. Y. Central R. R. Co.*, since reported in 40 *N. Y.*, 9 ; and in the cases of *Honegsberger* agt. *Second, Avenue R. R. Co.*, (33 *How.*, 210;) *Munger* agt. *Tonawanda, R. R. Co.*, (4 *Comst.*, 349;) *Spencer* agt. *Utica & Schenectady R. R. Co.*, (5 *Barb.*, 337;) cited for the defendant, and in a large class of cases of which they form a part, as well as the case, *Westfield* agt. *Roper*, (21 *Wend.*, 615,) there was no privity of contract between the defendants and the persons injured, the defendants had not assumed any special obligations or duties towards them, and were using their own grounds and road in the pursuit of their usual and ordinary business, a business too, conducted in such a manner that all persons were bound to know that the trains could not at once be brought to a stop, or turned aside, and that a collision with the train must be disastrous to anything with which it should come in contact, and where also, the persons injured

came on the road of the defendants of their own accord, with the full knowledge that they must look out for themselves. And under these circumstances the courts have held, where there was conflict of proof as to whether the proper signals were given, and in one or two instances where they were not, and when it was perfectly apparent, that the injured party had ample opportunity to see the train, and must have seen it if he had used ordinary care, that such want of care contributed to the injury. As in the case of *Spencer* agt. *The Utica & Sch. R. R. Co.*, where the train was in plain sight of the injured party, while he drove his team fourteen rods before coming on the railroad. In *Beisiegel* agt. *The N. Y. Central R. R.*, the plaintiff had no connection with the company as passenger or otherwise, and was attempting to cross the railroad on foot, while doing so, he was struck by the train. There was great diversity of sentiment in the court, a minority holding that upon the evidence, the defendant was not guilty of negligence, a still smaller number holding that the plaintiff was guilty of negligence, while two members of the court held, that the defendant was guilty of negligence, and that the plaintiff was not, and one member not voting; so that five judges concurred in a reversal, but on different grounds, there being no majority upon any one question. In *Munger* agt. *The Tonawanda R. R. Co.*, the cattle of the plaintiff strayed from his land, and got upon the track of the defendant's railroad, where they were killed by a passing train, and the court held it to be negligence for the plaintiff to let his cattle get upon the railroad, that thereby, they were trespassing, and that the negligence of the plaintiff, contributed to their death.

The cases of *Westfield* agt. *Roper, and Honegsberger* agt. *The Second Avenue R. R. Co.*, were cases, the one where the plaintiff was only two years old and was allowed to be in the sleigh track in a lonely place, where a child would not be supposed to be left, and while there was injured by

the sleigh of the defendant in passing along the road, the persons in the sleigh not seeing it; and the other, where a child six or seven years old, was run over by a street car in the city of New York, and in each it was held, that it was negligence in the parents of such children, to let them be so exposed ; that the negligence of the parents was imputable to the children as between them and third persons, and that the children could not recover any more than the parents could have done, if the action had been brought by them for the loss of services. And the same rule has been applied to the case of a lunatic, (*Willets* agt. *Ruffalo & Rochester R. R. Co.*, 14 *Barb.*, 585,) and is undoubtedly applicable to one who is *blind*, or who is so deaf as to be wholly unable to hear the signals which are required. The case of *Willets* agt. *The Buffalo & Rochester R. R. Co.*, is the only one cited where the injured party was or had been a passenger; he had been a lunatic for six or seven years, and was with his father who had him in charge and who had procured the tickets for both of them. At one of the stations the father got out, having the tickets and leaving the son on board, on getting on board again he missed his son, and some time afterward inquired for him of the conductor, and was informed that the conductor had called upon the son for his ticket, and upon its not being delivered he put him off at Alden, and it appeared that the conductor had no idea that he was insane, and sometime afterwards he was killed upon the track by another train which was passing on the road in the night, and in that case, the court held, not only that the railroad company was without fault, but that it was negligence of his father to leave him as he did.

I think the action before us is of quite a different character, and that principles materially different are applicable to it. A railroad company owes the duty to its passengers of making and maintaing at all times a suitable and safe track for its road, of furnishing comfortable and safe cars,

of running its trains regularly and safely, of so adjusting its time-table, and the passage of its trains, that no injury will be likely to be caused thereby ; and it is its duty to furnish safe and ready passage-way to and from its cars on either side thereof, and between them and its station buildings, when no notice to the contrary is given, and in all this to exercise the highest degree of skill and care. It's engineers, conductors and other employees engaged on the trains, and in employments directly connected therewith, are bound to know the times when trains are liable to meet or to pass each other, or to pass stations, and the duty is devolved upon them, if trains are out of time to be on the look out, and give seasonable notice to each other of any meeting of trains out of time or place, so that accidents and injury to life or property may be avoided, and in regard to this, also they are bound to exercise the utmost care and diligence.

It is conceded that the defendant was guilty of negligence which caused the death. And yet, it is important to ascertain the extent of it, because I think it will be found to bear strongly against the idea that the deceased was to be held culpable.

I think it was gross negligence in the company so to arrange its time-table, that within one minute from the time of passing an accommodation passenger train from a station, another train running at the rate of thirty or more miles an hour should pass the same point; for all experience shows it is impossible that the trains, without exception, can be so run as to stop at, and start from, or that an express train should pass a station at precisely the time fixed. It was negligence in permitting the express train, when it was perceived from it that the accommodation train was at West Mount Vernon station, to continue on and pass the station at its usual rate of speed, and it was the duty of its conductor or engineer under such circumstances, to slack its speed or to stop before reaching the station, and the case shows that the station was in sight of it for at least a

quarter of a mile, (1,345ft.) and if they did not at that distance see the accommodation train at the station, it was negligence, for they were bound to know that or their own train was out of time; as they should have met, according to the time-table, at least half a mile from the station; and indeed, from the point where they were accustomed to meet the accommodation train, the managers of the express train had reason to apprehend that it would be found at the West Mount Vernon station, and should have taken pains to give all necessary signals and to pass that place with care and caution.

The omission to ring the bell, or to sound the whistle of the express trian in regard to which there is no dispute was also negligence.

So, too, it was the duty of the conductor of the accommodation train and of the engineer, to know whether that train was out of time, and whether it was probable that the express train would pass the station while their train was there; and it was their duty, under the circumstances, to look out for the express train, and to signal it, if it was near; and it was also their duty to see that the passengers should be prevented from leaving the train on the west side, or at least to give them notice of the approaching train and to request them either to sit still until that train had passed, or to leave the train on the east side, and the omission to do so, of which there is no dispute, was negligence.

There is another rule of law which should be applied in this case, which is, that while a court can nonsuit a party in an action like this where, by the proof, it is palpable or *patent* that he is negligent, as illustrated by the decisions to which I have adverted, it has no right to draw inferences of fact to be derived from the facts and circumstances proved unfavorable to the plaintiff, and upon such inferences to decide the case. In other words, it is the exclusive province of the jury to determine what are

Gonzales agt. N. Y. & Harlem R.R. Co.

the inferences of fact to be deduced from the testimony, to the same extent that it is to decide the facts when the evidence is conflicting.

This well-established rule is well expressed by JOHNSON, J., in *Ireland* agt. *Oswego, Hannibal and Sterling Plank Road*, (3 *Kern.*, 533,) where he said: "It by no means necessarily follows, because there is no conflict in the testimony, that the court is to decide the issue between the parties as a question of law. The fact of negligence is very seldom established by such direct and positive evidence that it can be taken from the jury and pronounced upon as a matter of law. On the contrary, it is almost always to be deduced as an inference of fact from several facts and circumstances disclosed by the testimony, after their connection and relation to the matter in issue have been traced and their weight and force considered. In such cases the inference cannot be made without the intervention of a jury, although all the witnesses agree in their statements, or there be but one statement which is consistent throughout. Presumptions of fact, from their very nature, are not strictly objects of legal science, like presumptions of law. That the care exercised by the plaintiff at the time of the injury, and the negligence of the defendant, were both questions for the jury to determine, cannot admit of any doubt." This principle was also adopted in this court, in *Keller* agt. *The N. Y. Cent. R.R. Co.*, (24 *How.*, 177,) where in addition to what was stated by JOHNSON, J., Judge MASON said: "What constitutes negligence in such cases is determined by an inference of the mind from the facts and circumstances of the case, and as minds are differently constituted, the inference from a given state of facts and circumstances will not always be the same. I admit, the facts may be so clear and decided that this inference of negligence is irresistable, and in every such case it is the duty of the judge to decide; but when the *facts*, or the inference to be drawn from them, are *in any degree doubtful*,

the only proper rule is to submit the whole matter to the jury under proper instructions."

Each of those cases illustrate clearly that the rule laid down should have been applied to this case.

There is another rule applicable to this case, which is that in regard to all the obligations which a railroad company assumes towards a passenger, and I include all those which I have stated, and which I have stated to have been neglected by the defendant; that the presumption of law is that the defendant would properly discharge all of them, and that the passenger has a right to presume that it will all be done by the company and he has a right to rely upon and govern his own action accordingly, unless he is informed or notified to the contrary. (*Jettor* agt. *N. Y. & Harlem R.R. Co.*, 2 *Keyes*, 154; *Johnson* agt. *Hudson R. R.R. Co.*, 20 *N. Y.*, 65; *Sheridan* agt. *Brooklyn & Newtown R.R. Co.*, 36 *N. Y.*, 39; and also, *Hurlburt* agt. *N. Y. Central R.R. Co.*, 40 *N. Y.*, 145.)

Even if the deceased had known the time fixed for the passing of these trains, he had a right to rely that there would be no danger in his getting off as he did, and passing on the crossing north to the side of the road where the station buildings were. If the trains were run in exact accordance with the time-table, there would be no danger in his crossing the road where he attempted to, for the express train was not due until after the up-train had made its usual stop and had been gone a full minute, and it being the duty of the conductor of his train to see all about that and to have and observe the true railroad time and to give warning of any thing uncommon from which danger was to be feared, he had a right to rely that such duty would be performed, and it was not his duty to study the time-table, or to keep the true railroad time, or to examine his watch just before alighting to ascertain whether anything uncommon had happened. The company must receive, carry and discharge safely, as well those who have not watches as

Gonzales agt. N. Y. & Harlem R.R. Co.

those who have; those who cannot read as well as those who can; and those whose eyes are to some extent defective, and those who are lame, as well as those who are sound; for it will not do to require all such either not to travel at all, or to do so at their own risk.

So, too, more care must be exercised towards such passengers as are infirm, than such as are in full vigor of limbs and senses. ( *O'Mara* agt. *Hudson R. R.R.*, 38 *N. Y.*, 445; *Sheridan* agt. *Brooklyn City & Newtown R.R. Co.*, 36 *N. Y.*, 39.)

Again, if he was aware, in consequence of the nearness of his house to the station, that the trains passed there so near together, he must also have been conversant of the fact that usually the express train sounded its whistle before reaching the station, and he had therefore the right to assume, and it was not negligence in him in assuming, that it would do so then, and as upon the proof no bell was rung or whistle sounded, he was not negligent in assuming that the express train had not arrived, and would not until long after he could get across the road.

The getting off the train on the west side, was not negligence *per se*. In *Keller* agt. *The N. Y. Central R.R. Co.*, which was a case where the deceased left the car on the opposite side of the track from where the depot was and toward the other track on which an express train was coming and which killed her; the court, MASON, J., at p. 179, says: " They did not know it, that the express train was coming, and therefore had no reason to apprehend it, and certainly the deceased was no more negligent in getting off the train on this side than on the other side, had not the express train been running in." And again: "It was certainly not unlawful for them to get off the south side, and they were not negligent in doing so unless they had reason to expect a train to pass on the south track. Whether they were negligent or not, depends upon the question whether they had reason to apprehend danger. Now it

seems to me, if they had been familiar with the locality
and known the ground, and been familiar with it, they
were not negligent in getting off on the south side."

When this case was before this court after the first trial,
DWIGHT, J., in his opinion, said that: "He (the deceased)
had been frequently a passenger by the train from which he
alighted at the same moment." While the proof now tends
to prove very strongly that he never had, and had no
knowledge as to how the trains in question were run.
"And lived in sight of the crossing. He must have known
that the express train was due at that point within one
minute of the time, and allowing for very slight delay on the
part of the accommodation train that the express train was
liable to pass at that very moment. With this knowledge
it was especially his duty to look out for the train before
going upon its track. He either did look out for it or he
did not. If he did not he was guilty of negligence in the
omission; if he did he must have seen the approaching
train within a few feet of him, and his attempt to cross in
front of it was recklessness."

It may be that the facts as they appeared on the former
trial authorized the assumptions and inferences which were
drawn by the judge who wrote the opinion, and I can only
say that, in the light of the principles in regard to infer-
ences which I have alluded to, I find nothing in the state-
ment of facts contained in the report of the case authorizing
the court to draw such inferences. While it is quite clear
upon the evidence now, that the deceased had not been in
the habit of going home on that train, and the proof was
very strong to prove that he never had been, and that he
knew nothing about the meeting of these trains, for it cer-
tainly will not be claimed that these trains met there on
Sundays, which were the only days when, according to the
evidence, he could have been at home at that hour. I
think, also that the judge was mistaken, even if the deceased
did know how near in point of time these trains passed, in

imposing upon him all the care which he supposed it was his duty to take, and that he should have held that the employees of the defendant were bound to know as to all those things, and it was their duty if danger was apprehended to warn the passengers of it. The much vexed case of *Ernst* agt. *The Hudson R. R.R. Co.*, when it was last before this court, (39 *N. Y.*, 61,) seems to have decided, in a case between the railroad and a stranger attempting to cross the road, that no inferences of fact are to be entertained against him as matter of law by the court; that though the testimony was such that the jury might infer from it that he did not look to see if a train was coming, that the court could not do so as matter of law; and it also held that it would not be negligence for a person who had been accustomed to hear signals when trains crossed public roads, and who should cross such road with his team without looking to see whether a train was coming, when no such signal as the statute requires had been given from the train, and that such negligence on the part of the company was a proper element for the jury in considering all the circumstances relating to the question of negligence on the part of the deceased.

The remark of DWIGHT, J., in this case, that if Gonzales did not look for the coming train he was guilty of negligence, and that if he did look, and then attempted to cross the track, it was recklessness, must be confined to the case of a person having good sight if it had any application, for, on the first trial, no evidence was given of his defective vision.

There is a class of cases depending upon precisely the same principles which are applicable to this, and where the court have passed three times upon almost every question of fact, which is involved here. The case of *Keller* agt. *The N. Y. Central R. R. Co.*, (before cited from 34 *How.*,) once before the court, and the case of *Dickey* agt. *the same Railroad Company*, which has been twice under review.

Mrs. Keller and Mrs. Dickey her daughter, were pas-

sengers on board a mail train from Herkimer county, going west to Conastota, where it arrived a little behind time, running on the north or right hand track, and neither the mother or daughter had previously been there. At Canastota all the station and depot buildings, as well as the railroad hotel, were on the north side of the tracks, and there was no platform of any kind south of the southerly track, but there was the planking usually in villages, between the two tracks, and of the same level with the rails. Whether the mother and daughter or either of them heard the announcement of the station, which was made, does not appear, but after the train started on again, and while under considerable motion, they left the car on the south side, and reached the road-way safely, but were immediately afterwards struck by the engine of an express train from the west, which was running on the south track, and which was due there five minutes after the time for the mail train to leave the station, and were killed. It was proved that the conductor and other employees endeavored to prevent passengers from getting off on that side of the track, as they were aware that the express train was about to pass ; other facts were proved, and others were in dispute, but these stated were the ones upon which the case turned, or at least, were the most material.

In each case on the trial, the defendant moved to dismiss the complaint, or non-suit the plaintiff, on several grounds, among which were, 1st because no negligence, or wrongful act on the part of the defendant was proved, but the contrary, and, 2d because the undisputed evidence in the case showed positive carelessness on the part of the deceased, which contributed to the accident, which motion was denied, and defendant's counsel excepted, and in each action the jury rendered a verdict for the plaintiff. Both cases were appealed to the general term, and were affirmed, and appeals from these judgments were taken to this court. Several other questions were raised, but this court in the

case of *Keller*, passed upon them, and upon a full discussion of the question of negligence on the part of the deceased, affirmed the judgment, (24 *How.*, 173.) In the case of *Dickey*, the facts and questions being the same as in the Keller case, no opinion was written as to them the court, but granted a new trial solely upon the ground that testimony was admitted against the objection, and exception of the defendants which might have improperly influenced the jury as to the amount of damages, (23 *N. Y.*, 158.) The case of Dickey was again tried upon substantially the same testimony as before, and as in the Keller case, and the same motion was made to dismiss the complaint which was denied; the jury rendered a verdict for the plaintiff; from the judgment thereon, the defendant appealed to the general term where it was affirmed, and it was again appealed to this court. In the report of the case, 1 (*Keyes* 23,) the facts are fully stated, and the judgment was affirmed. It will be seen from the facts of that case as reported, that with a single exception that the deceased had not before left a train at Conastota, the proofs to show negligence on the part of the deceased were stronger than the case at bar, and in that respect, also there was no real difference, for upon the proofs in this case, it would be rashness for the court to infer that the deceased did know the time of the two trains in question at that point.

If we hold that a passenger who leaves the train at its usual stopping place, on the side towards the other track, though it be the side next to the station buildings, when no warning or notice of any kind to the contrary is given to him, is thereby guilty of such negligence as to make him chargeable with contributing to any injury he may receive, or if we require him not to pass from his train to the ticket office, or baggage room, or if he does so, though no intimation of danger is given to him, at his own sole risk, we shall remove two strong safe guards which the public, I think, now have against gross negligence on the part

of railroad companies at stations, and shall virtually absolve such companies from any risk or responsibility for the safety of their passengers, except while actually on the train, their time-tables may then be made up, and trains run without any regard to the safety of the hundreds of passengers who so frequently leave them at a single station. In my judgment, it is the duty of railroad companies at all times, so to adjust their business, as to make it safe for passengers (including those who are partially disabled in sight, hearing, limbs or physical strength,) on the arrival and stoppage of a train to pass between it and the depot. And that when from any unforeseen contingency it is not safe, it is the duty of its employees to know it, and take proper precautions to prevent the passengers from exposing themselves to the danger. That the passengers have a right to assume that it is safe for them to do so until notified to the contrary, and to act accordingly.

That the court below erred in non-suiting the plaintiff, but should have submitted it to the jury, and that the evidence would have warranted a verdict for the plaintiff.

The judgment below should be reversed, and a new trial granted, with all the costs to abide the event.

This case was tried a third time at the June term, 1870, of the New York superior court, before BARBOUR, Ch. J., and a jury, and a verdict of $5,000 rendered for plaintiff.

NOTE.—In some respects, at least, this case seems to be analogous to that of *Ernst* agt. *The Hudson River Railroad Company*. That case was first tried before Judge GOULD and a jury at the Rensselaer circuit, when a nonsuit was granted; the general term of the supreme court in the third district, HOGEBOOM, J., writing the opinion, set aside the nonsuit and ordered a new trial (19 *How* , 205). A second trial resulted in a verdict for the plaintiff of $2,500, judgment upon which was affirmed at general term. This judgment was reversed by the court of appeals, and a new trial granted; E. DARWIN SMITH, J., delivering the opinion of the court ( 24 *How.*, 97). On the third trial the plaintiff was nonsuited, in accordance with the opinion of Judge SMITH. This was affirmed at general term. On a second appeal to the court of appeals, the judgment of the supreme court was reversed and

a new trial granted; PORTER, J., delivering the opinion of the court, concurred in by an opinion of HUNT, J. (35 *N. Y.*, 9, *and* 32 *How.*, 61, *where the opinion of* PORTER, *J.; only, is published.)* On the fourth trial, the plaintiff had a verdict for $5,000; which was affirmed at general term; and on appeal by the defendant to the court of appeals this last judgment was affirmed (39 *N. Y.*, 61, *and* 36 *How.*, 84; WOOD-RUFF, J., delivering the opinion of the court, concurred in by an opinion of CLERKE, J.)

The present case of *Gonzales* agt. *The New York and Harlem Railroad Company*, was brought in the N. Y. Superior Court, and on the first trial resulted in a verdict for plaintiff, the judgment on which was affirmed at general term. On appeal by defendant to the court of appeals, this judgment was reversed and a new trial granted; DWIGHT, J., delivering the opinion of the court (38 *N. Y.*, 440). On a second trial the plaintiff was nonsuited, in accordance with the opinion of Judge DWIGHT. This judgment was affirmed by the general term. On a second appeal to the court of appeals this judgment was reversed and a new trial granted, FOSTER, J., delivering the opinion of the court, as above. On a third trial, since the last opinion, a verdict was rendered for plaintiff of $5,000.

The analogy between these two leading cases, consists principally in the concur-rence of views and decisions between Judges E. DARWIN SMITH, in the *Ernst* case, (24 *How.*, 97,) and those of Judge DWIGHT, in the *Gonzales* case (38 *N. Y.*, 440,) where it was considered that the fact of negligence of the deceased was so clear as to require the application of the law, by the court, in ordering a nonsuit. Also the concurrence of views and decisions between Judges PORTER, in the *Ernst* case (35 *N. Y.*, 9, *and* 32 *How.*, 61,) and those of Judge FOSTER, in *Gonzales* case, *(supra,)* where it was considered that under the additional evidence in each case, the de-ceased was not guilty of any negligence; although the fact which it was supposed constituted the negligence of the deceased, as proved in each case, was not changed or touched by the additional evidence, except, as alleged by Judge FOSTER in the *Gonzales* case, that the vision of the deceased was proved to be imperfect or im-paired; which it would seem, would go to increase, rather than diminish, his degree of negligence, as he should not undertake to cross, a railroad alone, if he could not see sufficiently to discover danger—saying 'nothing of the exercise of hearing. It will be seen, on examination of these four opinions, that Judges E. DARWIN SMITH and DWIGHT discuss the rights and duties of the railroad company in connection with the rights and duties of the deceased; whereas, Judges PORTER and FOSTER discuss only the *duties* of the railroad company in connection with the *rights* of the deceased. Omitting to give their views on the rights of the railroad company, and the duty of the deceased; which may be accounted for, perhaps, from the fact that the additional evidence introduced in each case, in their view, rendered the liability of the company so clear that such discussion was unnecessary.

These four cases, therefore, seem to leave the question unsettled, whether as a matter of law it is gross negligence for a person to attempt to cross a railroad in constant use, without looking each way upon the track to see if a train or engine is approaching. But the opinion of Judge WOODRUFF, in the case of *Ernst* agt. *The Hudson River Railroad Company*, (36 *How.*, 84,) seems to settle the law on this proposition in the affirmative. For he holds that a traveler approaching a rail-road track is bound to use his eyes and his ears, so far as there is opportunity. And that negligence in a railroad company in the giving of signals or omitting pre-cautions of any kind, will not excuse his omission to be diligent in such use of his own means of avoiding danger; and where by such use of his senses, the traveler might avoid danger, notwithstanding the neglect to give signals or warning, his omission is concurring negligence, and should be so peremptorily declared by the

Gonzales agt. N. Y. & Harlem R.R. Co.

court; and where proof of this is clear, the plaintiff thus negligent, should be non-suited. It is true that this law, as thus declared, condemns the judgment which the court gave in that case; because the evidence was positive and uncontradicted that *Ernst* neither looked one way or the other when approaching the railroad track.

The court of appeals, as organized in July, 1870, under the amended constitution, will probably have this question before them, and from the permanency of that court, it may reasonably be expected that a decision given by it thereon, will be followed and adhered to by the court, for fourteen years at least.—REP.

N. B.—Since the above NOTE was stereotyped (but not printed), we have seen the case of *Havens* agt. *The Erie Railway Company,* 41 *N. Y.,* (2 *Hand,*) 296, decided by the court of appeals in December, 1869. It is stated in the reporter's head note to the case, that "*Ernst* agt. *Hudson River R.R. Co.,* 39 *N. Y.,* 61, *and Wilcox* agt. *Rome and Watertown R.R. Co., id.,* 358, *approved and followed.*" The opinion in the former case by WOODRUFF, J., and in the latter by MILLER, J., confirming and establishing the law as originally announced by E. DARWIN SMITH, J., in the case of *Ernst* agt. *Hudson River R.R. Co.,* (24 *How.,* 97,) when that case was first before, the court of appeals, and now followed by the court, GROVER, J., in the case of *Havens,* (*supra,*) and also in the case of *Baxter* agt. *Troy and Boston R.R. Co.,* 41 *N. Y.,* (2 *Hand,*) 502, opinion of the court by GROVER, J. See also *Nicholson* agt *Erie Railway Co.,* 41 *N. Y.,* (2 *Hand,*) 525.