## William P. Campbell v. Agnes Campbell, James Campbell, Jennette Kimball, and Elizabeth Hubbard.

*Implied Trusts.* A widow in possession of premises of which her husband died seized procured, without the payment of any new consideration, to be executed to herself a deed of the premises, in order to cure defects in the title under which her husband went into possession. The title thus acquired she will hold in trust for the heirs of her husband, subject to her dower right.

*Declaration in articulo mortis.* A declaration by a husband on his deathbed to his wife that, if she pays off the mortgage on his farm and supports the family, the land would be hers,—cannot, even after full performance by her, be supported as a valid nuncupative will, nor as a valid contract.

*Husband and wife: Gifts.* A wife, who contributes of her own means to the purchase of land by her husband, who takes the title in his own name,—not insisting upon any agreement for repayment, or the conveyance of any interest in the land to her,—will, after her husband's death, be conclusively presumed to have intended the amount of her contribution as a gift to her husband.

CAMPBELL v. CAMPBELL.

*Lessee: Estoppel.* A son, being one of a family in the occupancy of a farm, to the fee of an undivided part of which he is equitably entitled by inheritance, who takes a lease of the farm from his mother, who had acquired the legal title,—the family still living together on it,—will not after the expiration of the time and the surrender of the possession, be estopped by such lease, to set up his claim to his part of the farm.

*Paying off mortgage: Lien for advances: Equitable adjustment: Interest as between tenants for life and in fee.* Whether a widow who for many years has carried on the farm which belonged to her deceased husband, and had brought up a family of children, during which time she had paid off a mortgage on the farm and had canceled the notes, but afterwards had taken an assignment of it to herself, is strictly entitled to hold a lien on the land for the amount paid by her; *Quære?* But when one of the children, after having arrived at maturity, files a bill for a partition of the premises, equity requires that, as between the widow and the complainant in partition, she should be compensated for her advances to pay off the mortgage; and that she should be allowed interest on the sums she has paid, except as to the proportion which her dower right should bear, upon the principle that while the estate in fee is chargeable with the principal, the life estate should keep down the interest. Interest due at the death of the ancestor, as between the tenants for life and in fee, will be treated as principal.

*Partition: Improvements.* When in a partition case between parties who have occupied the premises for a series of years, during which various improvements have been made by some of the parties in interest, the cost and relative value of which, by reason of the voluntary commingling of their accounts for advances and services, it has become impossible to ascertain; the whole subject of improvements will be dismissed from consideration in making the partition.

*Partition: Rights of parties as affected by disclaimer.* Where all of the defendants to a partition suit but one object to any partition during the life of the other,— their mother,—and insist upon her right to enjoy the possession of the premises entire during her life, and the right of the complainant to a partition is found by the Court, there can be no partition among the defendants who disclaim the right to it, and the decree must set off the complainant's interest only, and this subject to the widow's dower.

*Heard July 13. Decided October 11.*

Appeal in Chancery from Lenawee Circuit.

The complainant filed his bill in the Circuit Court for the county of Lenawee in Chancery, for a partition of a farm of which his father died seized, having the equitable but not the legal title, leaving a widow and eight children. By the subsequent death of one of the heirs—John—the complainant claims one-eighth of John's interest—one sixty-fourth of the whole; and by purchase of an undivided half of three of his sisters,—the other undivided half having been sold to James, one of the defendants, he claims thirteen and a half sixty-fourths, making in all twenty-two and a half sixty-fourths of the whole,

which he asks may be set off to him. The Court below made a decree for a partition as prayed for in the bill; and the defendants appeal to this Court.

*Geddes & Miller* and *A. Howell*, for camplainant.

*A. S. Millard,* for defendants.

CHRISTIANCY, J.

This was a bill praying (among other things) for the partition of a certain farm in the township of Franklin, in the County of Lenawee, described as being eighty acres off the north side of the southwest quarter of section seven, in township five south, of range three east; complainant claiming to be equitably entitled to twenty-two and a half sixty-fourths in fee, subject however to the dower of his mother, Agnes Campbell, in the farm, which had not yet been assigned.

The derivation and state of the title was this: John Brears, then the owner of the land, sold, and undertook to convey it to one Benjamin Ayers, in November, 1831. But, by mistake, no sufficient description of any land was inserted in the deed. Ayres, however, seems to have occupied it for years without suspicion of the defect, and without any claim from Brears, who seems to have died in ignorance of the mistake; and in January, 1845, Ayers, in good faith, conveyed the land to Andrew Campbell, the father of complainant, for the price of seven hundred and forty dollars, of which three hundred and eighty-one dollars was paid down, Campbell executing back to Ayers, a mortgage for three hundred and fifty-nine dollars purchase money, upon interest.

Andrew Campbell, ignorant of the defect or want of title, went at once into possession, improving the same and

residing upon it with his family until the last of August, 1846, when he died intestate, leaving Agnes, his widow, and eight children, including the complainant, all minors. John died intestate between 1845 and 1856, without issue, having never been married, and consequently his mother, Agnes, and each of his surviving brothers and sisters became his heirs in equal shares of one-eighth each.

The widow, who still continued to live upon and manage the farm, and brought up her family there (as will be more fully noticed hereafter) having fully paid off the mortgage given by her husband and taken an assignment of it to herself in 1853, afterwards, in 1859, having become aware of the defect in the deed from John Brears to Ayers, applied to Thomas Brears, the son and sole heir of John Brears, and for a nominal consideration (but without any payment in fact) obtained from him a quit-claim deed of the land to herself, by a proper description. In 1864 the complainant and his brother James, one of the defendants, purchased the right and interest of three of the sisters, Marion, Nancy and Hannah, and took from them a quit-claim deed, paying each of them one hundred dollars therefor.

Complainant claims, 1st. That the equitable title having belonged to his father, and the deed of Thomas Brears to his mother, intended by the grantor only to correct the error in the deed to Ayers, and having been given without any new consideration, ought, in equity, to inure to the benefit of the mother, and all her children then living, according to the respective interests that each of the children would have held if a good title had vested in their father; and that such was the intent of both parties at the time she took the deed. 2d. That the mortgage was paid off and the notes destroyed before it was assigned to her, and that it was paid from the income and avails of

21 MICH.—D³.

CAMPBELL *v.* CAMPBELL.

the use of the farm produced mainly by the labor of the complainant and his brothers, John and James, and that she was not therefore equitably entitled as against the heirs, to a lien upon, or compensation from, the land for the amount of the mortgage; and 3d, While he does not deny that the farm has been greatly increased in value since his father's death, by improvements made and buildings erected, he denies that his mother is entitled to any greater share, or that his share is to be in any respect diminished in consequence; because, as he insists, the improvements were made by him and his brothers, John and James, and claims by his bill, that he himself built the house on the farm at the request of his mother and the other heirs, at a cost of $750, for which he never received any pay (though in his testimony he admits that he had the farm four years by agreement for building a house of specified dimension, but built it larger and put in a cistern); and claims that he and his brother James built a barn, for which he never received any pay.

The defendants, Agnes, James, and the two sisters, who have not sold out, insist in their joint and several answer and in their testimony, that of the amount paid down by Andrew Campbell upon the land, over two hundred dollars was paid by notes which belonged to said Agnes; that her husband on his deathbed gave her the farm, on condition that she should pay off the mortgage and support the family; that she did support and bring up the family at a cost exceeding all the. help rendered by them to her; that she paid the mortgage and had it assigned to her for her own benefit; that the deed was obtained by her from said Thomas Brears, with the intent, and with consent of complainant and the other heirs, that she should hold the title and have the use of the farm during her own life, they to have their respective shares after her death; that

she was equitably entitled so to hold it; that complainant has recognized her title by hiring the farm from her as owner, and occupying it under such hiring at two different times; that complainant during his minority neglected his duty to his mother, being unsteady and disobedient, doing comparatively little for her or the support of the family; that he was fully paid for building the house by the use of the farm for four years under an agreement to that effect made with his mother, and by personal property received of her for the extra expense of building larger than agreed.

And finally, if the Court should find that complainant is entitled to any present remedy, he having no legal title, and being compelled to seek the aid of a court of equity to procure it, he is bound to do equity. And they insist that the mother is equitably entitled to an additional share in the land corresponding to the proportion of the original purchase paid by the notes which belonged to her, the mortgage and interest paid by her, and the increased value of the farm by reason of the buildings and other improvements she had put on it, and they aver that complainant was fully paid for the house he erected by four years' use of the farm under his own agreement with the mother, and for any extras, by personal property, which he received of her for that purpose.

As to the part-payment for the farm made by the notes, which had belonged to the mother, we think the fact that she consented to the transfer of the notes by her husband in payment for the land, and to his taking the title in his own name without insisting upon any agreement for repayment or conveyance of any interest to her, must be considered as conclusive evidence of the gift of the notes to her husband, and without any intention or right on her part, to reclaim on that account, any interest in the land as against him or his heirs. As to the verbal gift

of the land by the husband during his last sickness—which appears by the evidence to have been merely a conversation, when the making of a will was suggested to him, he, declining to make one, and saying that if she paid the mortgage and brought up the family, it would be hers,— it is not claimed that it constituted a valid, nuncupative will, nor a valid contract; and we think it was no more than the expression of an erroneous opinion. It can therefore add nothing even to the equitable rights of the widow, which must be determined by the other facts and circumstances of the case.

As to the legal title which she obtained by the deed from Thomas Brears, the evidence shows that the main object in obtaining the deed, and the only object of the grantor in making it, was to correct the error in the deed made by his father to Ayers; that until after the deed was applied for and he had assented to give it, it had not occurred to either of them to whom the deed was to be made for this purpose, and that the Notary who was called on to draw it, first suggested that a deed to a dead man would not be good, and that it could not therefore be made to Andrew Campbell, whereupon the widow suggested that it should be made to her, as she had paid for it; and it was so executed, without any new consideration. And we infer from all the circumstances, that the widow, though taking the deed in her own name, did so with the idea of securing the rights of the children as well as her own, without any intention of ultimately claiming the title in fee as against any of them, though, as we think probable, with the intention of holding the land for her own life, and managing the same as she all along had done, and upon her death that her children would be entitled to it; though we think she based this intention and this opinion of her rights, not more upon this deed than upon the idea

that she and most of the family seem to have entertained, that the supposed verbal gift of the husband gave her a life estate in the land; and the opinion and wish of all the heirs except, perhaps, the complainant, seem to have been that such were her rights under the deed; and all of them except complainant assented, or, at least, did not object to her holding the title in this way for her life. None of them, however, seem to have formed any very definite idea of what their legal rights were, all being willing that she should continue in the possession and use of the farm, and that all should continue to live together as one family, of which she was the head, as long as they chose to remain with her; a wish in which the complainant also seems to have participated, until he got into a quarrel with his mother just before the institution of this suit.

It is quite clear that at the time complainant and James purchased the shares of their three sisters, those sisters understood they had no right in the land during the life of their mother, and that complainant so represented to them; and the price given to the sisters, which was not to exceed one-third of the value of their interests, if they held in fee, confirms this idea. And James, who was a co-purchaser with complainant, testifies that such was his view of his mother's rights and those of the heirs; and he and his two sisters, who had not sold out, insist in their answer upon the right of their mother to hold the farm for her life under the Brears deed.

But whether they are or are not now estopped to claim in this suit as against her any interest in the land, except the reversion subject to the life estate, I can discover no satisfactory evidence of the complainant's assent to his mother's taking the deed in her own name, and for her own exclusive benefit, nor that he has given any irrevocable assent since the deed, that she should, as against him,

CAMPBELL *v*. CAMPBELL.

hold the whole estate for her life. And I do not think his having hired the farm of his mother and occupied it under her (which will be more fully noticed hereafter), can be allowed to estop him from claiming his right to the land. This was not an ordinary letting, as between lessor and lessee as mere strangers, but an amicable family arrangement, by which the family continued to reside and have their support on the farm, both and all parties living and working together as one family, an object, we may well suppose, which operated with complainant as part of the inducement to enter into the arrangement. He would not, therefore, under such circumstances, be so likely to insist upon his interest in the farm, and might well choose to forego, for the time being, any assertion of his individual rights, and be willing to make the agreed compensation for the use of so much of the farm as did not belong to himself without saying anything of his own title. Under such circumstances, therefore, and especially after the arrangement has been executed and fulfilled, and he has restored the possession to her, we cannot consider him as estopped from setting up his claim to a share in the farm. And, subject to such equities as his mother and the other heirs shall be found entitled to, we think his equitable rights are the same as if his father had died seized of the fee subject to the mortgage.

But as the legal title is vested in the mother, and he is obliged to call for the aid of a court of equity to obtain the legal title to his share, he must submit to do equity, and can only have relief upon the terms of allowing to the mother and the other heirs all the equities in their favor growing out of all the circumstances of the case. We must therefore consider what these circumstances are, as disclosed by the evidence.

At the death of the husband, the widow was left with

a family of eight children upon her hands, the eldest, John, being between seventeen and eighteen years old, Marion about fifteen, complainant twelve, Nancy ten, Hannah eight, James six, Jennette three, and Elizabeth less than one year. Her husband had left some debts unpaid. He had also left personal property, consisting of farming implements, horses, cattle, sheep, hogs, hay, and grain (mostly growing), to the value, altogether, of little over three hundred dollars, all of which, if administration had been had, would, after payment of the debts, have been exempt to the widow. He left also the farm, a small part only of which was improved, and subject to the mortgage of $359 with the interest, with a poor log house or hut, and no barn upon it. There was nothing deserving the name of furniture; and the family were in want of clothing and bedding, and the ordinary comforts of life.

Such were the slender means with which the debts and the mortgage on the farm were to be paid, and the family to be brought up and supported by the widow. The task was one from which an able-bodied man, though stimulated by the strong motives of parental attachment, might well have shrunk. But with a self-sacrificing devotion which no mere pecuniary compensation could ever stimulate or reward, and of which a mother alone is capable, she nerved herself to the task, and after years of unceasing effort accomplished it.

Wisely, as the result has shown, she determined to avoid the expense of administration. She paid the debts, paid and took up the mortgage, and with such aid as the older children, and the others in course of time could give her, she raised and supported the family, till the daughters were married and the sons arrived at maturity, and were able to make their way in the world. To accomplish the result, she worked incessantly, in doors and out,

CAMPBELL v. CAMPBELL.

taking in sewing, making straw hats, and turning her hands and those of her children to any work which offered, living as cheaply as possible, economizing in every way, and managing most judiciously to turn everything to account. All the children, except the complainant, seem to have been dutiful and industrious. He, to say the least, was less so, often disobedient to his mother, irritable and sometimes querulous, leaving home when his services were needed there, and working at other places, yet contributing from his earnings something to the common support. John, the older son, was the main assistance to his mother, until she had succeeded in paying the debts and the mortgage; the complainant, from the death of his father until the death of John, not having, as we judge from the evidence, contributed as much to the aid of his mother as she had expended for him.

Shortly after the death of John, complainant, about the time he became of age, made a contract with his mother for the use of the farm for four years, he to have as his own, all the horses and live stock on the farm, with certain specified exceptions, the use of all farming implements, etc., and the labor of his younger brother, James, and the family to have their living from the farm, all living together, as one family; and, in consideration of what he could make beyond the support of the family in this way, he was to buid a new farm dwelling-house of specified dimensions. This agreement was performed. He built the house considerably larger than agreed, painted it and put in a cistern. But, on the other hand he was paid by his mother, in stock and otherwise, more than originally agreed, and, as she claims, all the excess of cost. He, however, denies that the whole was paid, though he admits the agreement and the four years' use of the farm.

After the expiration of this four years, the farm was

rented by the widow to her son-in-law, Ostrander, for one year; and soon after the expiration of the latter time, she again let it to complainant and his brother James, for no definite period, they also to have the use of the stock and personal property; and to support the widow and the two younger girls, who were to keep house and assist them in carrying on the place.

Under this arrangement they kept the farm near seven years, and seem to have given it up in the fall of 1866 or the spring of 1867, dividing with the widow the crops then growing on the ground, or attempting to do so. But in the spring of 1867, when complainant seems to have left the house, he got into a quarrel with his mother about certain property in the cellar and crops on the ground, and then, for the first time, set up a claim of right in the farm as against his mother, and threatened to bring suit against her.

While he and James had the farm under their arrangement, they had built a barn upon it, which by the arrangement they were not bound to do, and for which it is not claimed they received any compensation, except the use of it while they had the farm.

These improvements are still upon the land and give it an increased value, but whether to the full extent of their cost, we are not informed by the evidence. But if either party (the widow and the other heirs who are defendants, on the one side, or the complainant on the other) has contributed more to the improvements than the other, in proportion to their respective interests, then, upon equitable principles, the inequality should be adjusted in the partition, if any certain and intelligible basis can be discovered by which this can be done.

By their answer, the defendants, James, Jennette and Elizabeth have, we think, estopped themselves from claim-

ing in this suit as against their mother, any income from, or control over this property during her life, and have consented and insisted that she should have the benefit of all the proportion they might have had in the use of the farm for the four years when complainant had it for building the house, and any share they might have had in any part of the consideration given to complainant.

The result, I think, is the same, as if at the time he built this house, he had already become the owner of the interests, since obtained from the three sisters. And, as the house was made larger, and the cistern constructed with the approval of the mother, this may be taken as a part of the agreement, except that he was to be compensated for any excess in the improvements made beyond the cost of such house, as was specified in the agreement, in addition to the compensation there provided.

But these improvements were to be made on the *farm*, of which he then owned one-eighth and one sixty-fourth, and has since obtained thirteen and a half sixty-fourths, with the same rights, as if he had owned the latter when the improvements were made. These improvements, therefore, must be held to have been made for the common benefit of the property, of which he owns twenty-two and one-half sixty-fourths, and his mother (as above explained for the purposes of this suit) forty-one and a half sixty-fourths; and each should equitably contribute to them in this proportion.

If, by the understanding of the parties, the improvements originally contracted for, or those actually made were to have been, or were, actually paid by the use of the farm alone, (which must be treated as the common property of the widow and the complainant, in the proportions just stated) the case would be very clear; for then the share of each would have contributed in its due proportion. But

as the use of the farm alone was only a part of the consideration, even for building the smaller house of which the specifications were stated, and he was to have and did have in addition, by agreement, certain stock and other personal property, and the use of the farming implements, and the labor of his brother James, which enured to his mother's benefit, and she also gave him, to apply on the extra expense, certain other personal property; it would seem equitable that she should be allowed for this, or or rather so much of it as, with her proportionate share of the use of the farm, exceeded her due proportion of the whole expense.

But precisely here, in my view, arises the difficulty. There were several considerations for the single contract of complainant for making the improvement, and it is impossible to ascertain the relative value or importance of each in the minds of the contracting parties, or either of them; how much the use of the farm was estimated by complainant to be worth to him, or what his mother valued it; how much the use of the personal property, the labor of James, etc., and the relative value of each. The contract was silent upon this point. The parties had jumbled all the considerations together as one and entire; and we cannot apportion, nor could the evidence of witnesses enable us to apportion the various considerations, assign the separate and relative value to each; and say how much was paid by the use of the farm alone, without making, in effect, a new contract to which it is by no means certain the parties would have assented; especially, as the improvements were to be made upon the farm, of which each had a share. There is another point connected with these improvements and the consideration which complainant was to receive as the inducement, which must not be overlooked. From the nature of the case, as already noticed,

we may well suppose, in this amicable family arrangement, the keeping the family together on the farm, and their common support there with the complainant, was a part of the consideration and of the inducement, as well to the complainant as to his mother. It is difficult to measure the relative force of this inducement, though we should be satisfied, that without it, neither the complainant nor his mother would have entered into the arrangement.

While, therefore, as far as I can judge from the evidence, the widow probably paid something beyond her share towards these improvements, there is no safe or intelligible legal or equitable basis, under the loose arrangement made by the parties, by which the excess can be calculated or ascertained. I think, therefore, nothing can be allowed to the widow for these improvements.

But this is the less to be regretted, because she has had the use of them, and because the complainant's claim for half the expense of building the barn, is also subject to a like infirmity. He and his brother built it while they had the farm for an indefinite period. They were not bound to build it, nor does there seem to have been any request of the mother to that end. From the evidence we are satisfied, that much, if not the whole of their inducement for its erection was the use and convenience they expected to derive, and did derive from it, while they held the farm on the terms of the agreement. The uncertain equity, therefore, in favor of complainant, connected with the barn, may be considered to balance a like uncertain equity in favor of the widow with respect to the house. At all events this—owing to the loose mode in which the parties dealt with each other—is the only disposition we can well make of it. As to the improvements made by clearing up the farm, the evidence shows but very little. We judge from it that they were principally made while the widow carried on the farm,

before she let it to complainant, and some small portion afterwards; and they may reasonably enough be considered as having been made from the income of the farm itself, and though mostly at the expense of the widow, yet she has had the benefit of them, which we judge from the nature of the case, must by this time, have been an adequate compensation. This disposes of the question of improvements.

As to the mortgage paid by the widow, it is unnecessary to determine whether she, having paid off the mortgage and canceled the accompanying notes or evidence of the debt before the mortgage was assigned to her, could acquire or continue strictly a lien upon the land for the amount; since complainant is compelled to ask the aid of a court of equity to obtain from his mother the legal title; and the Court, according to the recognized principle in such cases, are bound to give him that relief only on the condition of his recognizing all the equities in her favor. And I think she is equitably entitled to compensation for the mortgage paid by her, except such proportion thereof as should be borne ratably by her interests inherited from her son John and her dower (so far as the latter is chargeable with the interest upon the mortgage as explained below).

The mortgage was a lien upon the whole property, and all except the portion corresponding to her own interest was so much money paid to the use of the other part owners and to remove a lien upon their interests, and complainant on partition should make good to her, his proportion, twenty-two and a half sixty-fourths (being the sum as stated below as now due) either by way of money compensation, to be paid before the commissioners proceed to set off his share, with interest from this date, on the sum stated below as his proportion of principal, on account of the mortgage, or by having a corresponding amount in

value of the land deducted from his share on partition, at his option.

In estimating complainant's share of the encumbrance, it is not necessary to notice particularly the other shares of the land held in fee, but as between the owners of the fee and of a life estate in the same encumbered property, it must be remembered that the life estate is to keep down the interest, as its share of the incumbrance, and the fee is to be charged with the principal.—*Saville v. Saville, 2 Atk., 463 ; Shrewsbury v. Shrewsbury, 1 Ves. Jr., 233 ; Warley v. Warley, 1 Bailey Eq., 397 ; Mosely v. Marshall, 27 Barb., 42 ; 4 Kent's Com., 74 to 76 ;* except, perhaps, where the rents, or use of the property, is less than the interest (*Kensington v. Bouvierie, 31 Eng., L. & Eq., 345*), which clearly was not the case here.

The widow had from the death of her husband a life estate in one-third of the premises as her dower, and must be charged with the interest on one-third of the encumbrance from the death of the husband. The fee must pay the whole principal and two-thirds of the interest, and must also be charged as principal with all the interest which had accrued before the death of the husband, when the life estate commenced.

The widow having paid the whole principal and interest, is, as between herself and the other owners of the fee, to be allowed to treat the two-thirds of the interest paid by her on account of the fee, as so much principal from the time the respective installments became due, and to charge interest on the same from such respective times.

The complainant's twenty-two and a half sixty-fourths of the encumbrance paid by her, calculated upon these principles, amounts at this date to three hundred and twenty-five dollars and twenty-one cents, and the amount of principal (included in the above), upon which he is to be

charged with interest until his election is determined, and to be added to the above, is one hundred and sixty-eight thirty-eight-one-hundredth dollars.

The decree in the court below was for a partition setting off the shares of all the heirs, as well as that owned by the widow. But I am at a loss to discover upon what principle this can be done, where all the other heirs having an interest are defendants, and have joined with the mother in asserting, by their answer, the right of their mother to the whole land for life, insisting upon her right so to hold it, and objecting to any partition of it during her life. Shall the Court force their shares upon them against their will? As between those heirs and the widow, this, it seems to me, is as complete a disclaimer of all right to the land till after her death (so far as this suit is concerned), as if they had given her a quit-claim deed of a life estate.

Complainant's share should be so set off as to leave one-third of it to be designated by metes and bounds, subject to his mother's life estate therein, as her dower in his share of the estate.

The decree of the Court below must be reversed with costs in this Court, and a decree entered in this Court in accordance with the principles above laid down, and the record must be remitted to that Court for such further proceedings as may be necessary to carry this decree into effect, and for a final decree in partition.

The other Justices concurred.