# The Michigan Central Railroad Company v. John W. Coleman and another.

*Husband and wife: Wife's right of action for tort: Parties: Misjoinder.* Under our statute (*Comp. L.*, § 4804), an action for the personal sufferings of a married woman from an injury received in a railroad accident should be brought by the wife alone, and not by the husband and wife jointly; the statute supersedes the common law in this respect.

*Amendments.* Whether where husband and wife have sued jointly for such a cause of action the error may be remedied by amendment :—*Quære?*

*Evidence: Errors that do not prejudice.* The admission of evidence against objection as to the location and dimensions of the platform and other surroundings of the depot where the accident occurred, at the time of the trial, in the absence of any showing what changes had been made since the date of the accident, several years before, is error where any change has taken place; but in this case there being some evidence of how far the differences went and no indication that harm can have come from the admission, the error, if any, is held immaterial.

*Custom: Evidence: Time.* Testimony concerning the usages of runners and hackmen at remote periods, to establish a custom at the time of the accident, is objectionable.

*Evidence: Irrelevancy.* Evidence on re-examination of a physician who had once attended the plaintiff, that he had at one time thereafter visited her with certain physicians sent by the defendant, was irrelevant.

*Evidence: Statement of agent.* The statement of defendant's brakeman, made after the accident, that the train should have stopped longer, was inadmissible.

*Burden of proof: Contributory negligence.* The burden of proof is on the plaintiff in such an action to show that the defendant is entirely responsible for the grievance complained of, and that negligence on her part did not contribute towards the injury; the plaintiff must establish completely whose fault it was, and explain the whole transaction.

*Care: Negligence: Prudent management.* The degree of care required in any business must be proportionate to its nature and risks, but the law does not require business to be conducted upon any unusual basis, though the business be one of great risks and requiring great caution. All rules applied must be reasonable and not oppressive, and must be applied with reference to the ordinary conduct of affairs.

*Charge to the jury: Railroads: Diligence: Negligence.* A charge to the jury, that carriers of passengers are "legally bound to exert the utmost care and skill in conveying their passengers and are responsible for the slightest negligence or want of skillfulness either in themselves or their servants;" that they are "bound to the utmost care and skill in the performance of their duty;" that the degree of responsibilty to which they are subjected is "not ordinary care which will make them liable for ordinary neglect, but extraordinary care which renders them liable for slight neglect," etc., is too exacting in its requirements. Railroads are only held to the duty of being prudent railroad companies and to the diligence embraced by the common rules of good railroad management.

*Requests to charge.* The practice of asking a multitude of slightly varying charges in an abstract form is criticised as being mischievous, and tending frequently only to befog the jury.

*Railroads: Depots: Platforms: Negligence.* Where a railroad company has a platform and other facilities for entering and leaving the cars with safety on the depot side of their track, the failure to have the opposite side likewise prepared as a place for entering and leaving the cars cannot be regarded as negligence; they may select and adhere to such arrangement of their depots and platforms as they see fit, if those they make are safe and commodious.

*Negligence: Passengers: Depots: Platforms.* Passengers cannot be supposed to be ignorant of the necessity and use of platforms, and when a platform is in plain sight, which they must know was made for their use, they cannot properly complain that they are not accommodated ; they are required to conform to the reasonable business arrangements of the railroad.

*Railroads: Conductors: Negligence: Looking out for passengers.* The duties of conductors of night trains, when stopping or starting, in looking out for the safety of passengers entering and leaving the cars considered, and held that they are not required to be on the look-out for passengers to get aboard from both sides of the train, and are not at fault for not discovering a passenger attempting to get on from the wrong side.

*Contributory negligence: Getting aboard the cars.* A plaintiff who arrives at the depot before the cars, with plenty of time to go upon the platform, but who deliberately waits upon the ground on the opposite side of the track, and when the cars come along attempts to get aboard from that side, and especially after dark, and is thrown off by the cars starting before she is securely on, cannot be said to be free from negligence contributory to the result.

*Heard October 30. Decided January 7.*

Error to Kalamazoo Circuit.

*Edwards & Sherwood, D. Darwin Hughes* and *G. V. N. Lothrop,* for plaintiff in error.

*Severens & Boudeman,* for defendants in error.

CAMPBELL, J.

Suit was brought and judgment recovered by defendants in error, who are husband and wife, for damages from an injury to the wife, March 15, 1868, at Dowagiac. The accident happened as she was getting upon a passenger train, which started before she was securely on board; and she fell upon a heap of iron near the track, and was thereby seriously hurt. Various questions arose upon the trial, supposed to bear more or less directly upon the relative duties and responsibilities of the parties, arising out of the circumstances. There is, however, a preliminary question of some consequence, which will first claim attention.

Objection is made that the suit is improperly laid in the joint behalf of husband and wife. The action was begun before the decision of *Berger v. Jacobs*, *21 Mich. R.*, *215*, where it was held a married woman might sue in her own name for such injuries, and it is not now insisted, therefore, that a sole action would not lie. But the question now raised is whether husband and wife may join in spite of the separate right of action.

At the common law such a grievance might give rise to a double right of action,—one to the husband, for his damages by loss of service and other incidental losses to himself, and one to the wife for her personal sufferings. It was held in *Hyatt v. Adams, 16 Mich. R., 180*, that the husband could recover nothing for the personal grievances of the wife, and the rule is equally clear that an action in right of the wife could not cover any of the peculiar damages and grievances of the husband. The grounds of relief are distinct in all respects.

The declaration in the present case is for such damages as are peculiar to the wife, and the common-law action would have been brought in the name of the husband and wife, if brought during the life-time of the husband. By our present statutes, as amended in 1857, "actions may be brought by and against a married woman in relation to her sole property, in the same manner as if she was unmarried."—*2. Comp. L.*, § *4804*. It is claimed by plaintiff in error that this provision supersedes the common law, and by the defendants that it is merely cumulative.

As a general rule the joinder of two plaintiffs in an action at law for damages involves the assertion of a joint right which would survive to the longest liver. But whether surviving or not, it indicates a proprietary right in each, but one which belongs to neither alone. The exception made in the case of husband and wife was on peculiar grounds applicable to no other class of cases. The wife could never at common law sue alone. Her chattels belonged to the husband by right of marriage, and her rights in action

belonged to him if reduced to possession, or put in judgment during the marriage, but remained her own if she survived him.   The suit being necessary to complete his right, and she having a qualified and contingent right also, which might become fixed by his death before judgment, the law allowed and required this double interest to be prosecuted in a joint action.   The husband was not joined as his wife's guardian, but in his own right, as entitled to reduce the claim to possession for himself, if he could do so.

In all cases in equity in which a suit was brought to enforce a wife's separate interests, in which he had no rights, the better doctrine was that no such joinder was proper.   In *Wake v. Parker, 2 Keen, 59,* the doctrine was very fully considered, and a demurrer sustained on that ground.   It was held that while the practice had been frequently resorted to, it was wrong in principle and had not been maintained when the objection was pointed out.   Such a suit was held to be practically under the control of the husband, whether the wife assented to the joinder or not, as it placed her under his influence and control in regard to rights in which it should not be permitted.   It was said further that a decree in such a case would not bind the wife so as to prevent her from beginning another suit on her own behalf.   In *Simons v. Horwood, 1 Keen, 7,* the master of the rolls in a similar case said "This is the husband's suit, and the wife, for all the purposes of this suit, must be taken to be under the influence of the husband." See further to the same effect.—*Mole v. Smith, 1 Jac. & W., 645; Hughes v. Evans, 1 S. & S., 185; Sigel v. Phelps, 7 Sim., 239; Reeve v. Dalby, 2 S. & S., 464; Owden v. Campbell, 8 Sim., 551.*

The objection is regarded as one resting on more than mere form.   The law has very generally regarded the transactions of the wife jointly with the husband as quite likely to be subject to his influence, and where those have been required to be protected by a separate acknowledgment,

the married woman's acts have not dispensed with it.—See *Fisher v. Meister, 24 Mich., 447.*

The statutes concerning the rights of married women are not at all uniform in different states, and it is not strange that the practice should vary under them. In New York, in *Hunt v. Johnson, 19 N. Y., 279,* the court referred to the code as requiring a joinder in all cases except those relating to separate property, and merely permitting and not requiring a sole action as to that, but left the point undecided because there had been an express consent to the joinder. For this same reason it was not decided whether a right of action for a tort was the wife's separate property,—a point decided in this state in *Berger v. Jacobs.* But in *Ackley v. Tarbox, 31 N. Y., 564,* the supreme court was held to have committed a legal error in not allowing the husband's name to be stricken out, under a provision in the code allowing such a practice as to parties who are improperly joined. In Indiana the joinder is held to be optional.—*Martindale v. Tibbetts, 16 Ind., 200.* In Massachusetts the common-law practice is retained.— *Burns v. Lynde, 6 Allen, 305.* In Illinois it is declared the better practice for the wife to sue alone.—*Emerson v. Clayton, 32 Ill., 493.* But in *Burger v. Belsley, 45 Ill., 72,* where a husband had been joined, the court recognized his right to refuse to allow the case to proceed without indemnity. These indicate that no fixed rule prevails, and that the old practice cannot be retained without creating serious difficulties.

It is impossible to consider any plaintiff in a suit at law as having no personal status in the case. Presumptively all joint plaintiffs pursue what is supposed to be a joint interest. The exception at common law in cases of husband and wife made the husband the controlling party. To make him a mere cipher in a case where he appears as plaintiff would be a departure from both common law and equity practice. There is no sound reason for such an innovation, and it cannot fail to create serious controver-

sies as to costs, and also in cases of survivorship, which ought not to be left open. We think the objection was properly raised, and that the misjoinder was fatal, inasmuch as each party might have had a separate cause of action for damages from the grievance complained of, and the husband has no interest in his wife's damages. No amendment was asked for, and it has not been made to appear how it could be perfected under our practice. We do not wish to anticipate any action which it may be thought possible to take in that direction, and as the main questions which are presented by the record will perhaps arise in any suit or trial which may be had, it will be best to dispose of them without prejudice to the question of amendment.

The plaintiffs rely for recovery upon the ground of negligence, which is mainly based upon the neglect of the railroad officers and servants to see that plaintiff had convenient means and opportunity to get upon the cars and enter them safely. The evidence refers to various matters supposed to bear upon this principal question. There are also some minor and collateral inquiries.

An objection was made to evidence showing the location and dimensions of the platform and other surroundings of the depot at the time of the trial, as having no tendency to show the state of things at the date of the accident several years before. This would have been improper evidence by itself, but it would be proper if shown that there had been no change, or how the changes had been made. It was admitted on this ground, and there was some evidence given to show how far the differences went. We can see nothing in the case to indicate that any harm can have come from the admission. It is generally of some importance to be informed concerning the position and appearances of all places about which any inquiry arises, and while it is true that under cover of such questions there may sometimes be introduced testimony quite dangerous and misleading, yet this cannot happen very often,

and it is not proper to reverse a judgment on any point not really material, or which may not have caused the jury to go astray. The testimony introduced concerning the usages of runners and hackmen at remote periods was objectionable because used to establish a custom claimed to have been very material in the cause. Such usage at or near the time of the accident would not be objectionable for remoteness. Its importance and propriety depend on other considerations, which will be referred to in their place.

It was also alleged as error that a physician who had once attended Mrs. Coleman, was allowed to show on re-examination that he had at one time thereafter visited her with certain physicians sent by the railroad company. This is claimed to have been irrelevant, and it certainly was so, and ought not to have been permitted. It is doubtful, however, whether it would have had any influence on the jury without a manifest perversion of its significance. It does not become important in our view of the case, and we shall not discuss it further.

The plaintiff, John M. Coleman, was allowed to detail a conversation with a brakeman, in the cars a short time after the accident, in which the latter said the train should have stopped longer. This was clearly inadmissible. It was not a statement explanatory of any thing in which he was then engaged, but related to a past transaction, and was a mere fragment of hearsay testimony, and that of a matter of opinion belonging to the jury so far as it became important, and not to be decided in that form by a witness. There was no ground laid for it as an impeaching question, as no brakeman was identified, and there is no rule which will allow a jury to guess at which one of several witnesses may be supposed to be impeached by evidence that applies to no one in particular. There is nothing to change its character as a statement concerning a past transaction. The authorities allowing proof of *res gestae* are not applicable.—*Barker v. Binninger, 14 N. Y., 270 ; Luby v. Hud-*

*son R. R. R., 17 N. Y., 131; Detroit & Milwaukee R. R. Co. v. Van Steinburg, 17 Mich. R., 99.*

All of the remaining questions grow out of so much of the case as refers to negligence in either party.

The question as to the party who has the burden of proof is not open for discussion in this court, having been settled in various controversies heretofore. The plaintiff is bound in all cases to show that the defendants are entirely responsible for the grievance complained of. It must appear from this showing that all the material negligence that led to the accident was on the part of defendants and their agents, and that plaintiff did not contribute towards it. Plaintiff must establish completely whose fault it was, and explain the whole transaction.—*Detroit & Milwaukee R. R. Co. v. Van Steinburg, 17 Mich. R., 99; Lake Shore & Mich. S. R. R. v. Miller, 25 Mich., 274; Kelly v. Hendrie, 26 Mich. R., 255.*

The matters relied on upon both sides on the issue of negligence relate to the circumstances under which plaintiff attempted to get upon the car, and was thrown from it. The negligence set up against the company is a want of care in seeing that plaintiff had time and facilities for getting on board safely, and against plaintiff for not using the means furnished by the company to provide for the safety of passengers.

It is unfortunate that in dealing with questions of negligence in suits against carriers of passengers the difference between the various classes of accidents has not been more carefully noticed. Except in a very general way the regulations which safety requires in one case do not very closely resemble those needed in another. It is very plain that presumptions of fact may be properly raised under some circumstances from the nature of the casualty, which could not arise or demand explanation in another. For example, where a passenger is quietly seated in a car, and is injured by a collision, or a break-down, or by the cars leaving the track, there can be no room for any inquiry on the ques-

tion of contributive negligence. The rule of care and caution to be applied in any case must properly be one required by the nature of the case, and such as the circumstances call for. And in considering precedents, we can never leave out of view the peculiar circumstances which may or may not require the same conduct necessary in others. Perhaps as neat a statement of this principle as has been given is found in *Blamires v. Lancashire & Yorkshire R. W. Co., L. R., 8 Exch., 283.* In that case the question was, whether a failure of providing means of communication with the persons in charge could be allowed to go to the jury, and there being evidence that such means were well known, and that they might have prevented the mischief, the jury were allowed to consider it. *Brett, J.,* in giving the reasons for his concurrence in that view said: "It is an action for negligence, and the plaintiff is bound to prove that the railway company have been guilty of doing something which a railway company of ordinary care would not do, or omitting to do something which a railway company of ordinary care would do." And there being evidence that such precautions were customary among companies of ordinary care, he was of opinion the case was one for the jury. And *Grove, J.,* said: "If a particular precaution has not been hitherto known or used, or if its use is obscure, the omission of it is not negligence; but if it is used to any considerable extent, that changes the case, and makes the omission some evidence of negligence."

The degree of care required in any business must be proportionate to its nature and risks, and the business of railroads is one of great risks and requiring great caution. But the law cannot require business to be conducted upon any unusual basis. It is only experience and advancing knowledge that enable remedies to be adopted for dangers that have not been so common or serious in their consequences as to turn attention to their removal. And changes in methods of doing business, or differences of method between different parties engaged in it, are quite as likely

to imperil safety by the uncertainty and perplexity to which all persons would be exposed, as the failure of any one to adopt some possible safeguard that has not usually been adopted. All rules applied must be reasonable and not oppressive, and must be applied with reference to the ordinary conduct of affairs.

Every one has a right to expect that railroads will be managed according to the common custom, and railroad companies have a right in their turn to expect conformity to this. Every person dealing with them has his own duties to perform in harmony with theirs.

While recognizing to some extent the bearing of these principles some of the rulings below departed from them. The jury were told that carriers of passengers are "legally bound to exert the utmost care and skill in conveying their passengers, and are responsible for the slightest negligence or want of skillfulness either in themselves or their servants." "That the law is, that common carriers of passengers are bound to the utmost care and skill in the performance of their duty. That the degree of responsibility to which carriers of passengers are subjected is not ordinary care, which will make them liable for ordinary neglect, but extraordinary care which renders them liable for slight neglect. It is the danger to the public which may proceed even from slight faults, unskillfulness or negligence of passenger carriers or their servants, and the helplessness in which passengers by their conveyances are, which make this duty of extraordinary care a legal one."

The language used would fairly permit the jury to find any thing to be negligence which could by any possibility be avoided. But negligence is neither more nor less than a failure of duty. All railroad companies are held to the duty of being prudent railroad companies, and bound to conduct their business with such precautions as prudence has usually found necessary. As compared with the care needed in business involving no possible human risk, the care to be used may be properly enough called extraordinary,

28 MICH.—57.

but as compared with each other all such companies have the same duty.    They would·be of no sort of service to the community unless run with regularity and promptness. The delay of a train is at all times likely to derange the business and imperil the safety of others.    The officers of every train are as much bound to look to their running time, for the safety of other trains, as for the convenience of those who may be on board their own.   Each train must be moved by one responsible authority, and the course of business must be such as to enable this authority to be safely exercised.   Any instructions which leave out of sight the fact that railroads must be conformed to system, and cannot be likened to those means of transit in which the business of a single vehicle cannot endanger any other, or which compels a departure from the common rules of good railroad management, is directly calculated to mislead.

The difficulty has evidently arisen partly from the insertion in the requests of more or less abstract propositions. The same rule which forbids reading law books to the jury is violated in spirit, if not in letter, by spreading out before them mere general rules of law, without such immediate application to the case as will enable them to see their true bearing and limitations.    Where such instructions are asked, the court cannot always, on the spur of the moment, determine how far they may confound the jury. The practice, which is becoming too prevalent, of asking a multitude of slightly varying, charges in an abstract form, is doing great mischief, and it is difficult to conceive how, in many cases, a jury can fail to be befogged by them.   In the present case we discover nothing to indicate any such desire, and the number of such propositions is neither great nor unusual.    Most of the requests are sufficiently distinct. But cases of negligence involve so many considerations that very great caution is needed in laying down rules too generally.

The remaining questions arise more directly out of the special facts in proof, and are so connected that it will be necessary to consider them together.

The facts show that the railroad depot at Dowagiac is south of the track; that there is a sufficient platform extending between the depot and the track, and that there is a sidewalk coming down from the town on the north side of the depot, terminating at the platform at the center of the depot. A few feet west of the sidewalk and north of the track is a telegraph pole, and near this was a heap of iron on which plaintiff was injured by falling from the steps of the car which she was about entering. She came down before the cars came in, but did not go to the platform, and remained on the north side of the track. After they had come in she attempted, just as they were about starting (but there being some question how long after they stopped), to get upon the steps of a car from the ground, and as the cars started fell off and was hurt. The conductor was on the platform south of the cars while there, and kept watch for passengers on that side, but not upon the other, and she was not seen when she got upon the car step. The accident occurred after dark.

There was testimony received which was allowed to go to the jury as tending to prove that persons had got on and off the cars on the north side, and this was received as bearing upon the relative duties of the parties in providing facilities on that side and in getting on the train there. It was not disputed that there were no facilities for passengers on the north side. There was evidence that a light was kept on the telegraph pole, and some stress was laid upon this fact on the argument.

We think there was nothing to authorize the failure to have the north side prepared as a place of entering and leaving the cars, to be regarded as negligence. No authorities, which we have been able to find, have questioned the right and duty of railway companies to select and adhere to such arrangement of their depots and platforms as they see fit to make, if those they make are safe and commodious. That is a matter which they must decide for themselves. It is a part of their own business arrangements.

If they have no such facilities, or if they habitually receive passengers elsewhere, they may be expected to take such care as those circumstances call for.

The traveling community, when they know that cars start from a depot, and when they resort thither to reach them, cannot be supposed to be ignorant of the necessity and use of platforms. They must be assumed to know they are made for the purpose of enabling passengers and baggage to be put on and off securely. All of our cars are so made that they may be reached from whichever side a platform may be, and this mode of construction renders it impossible to prevent persons from using the other side if they choose. But when there is a platform in plain sight, which they must know was made for their use, they cannot properly complain that they are not accommodated. The courts have had frequent occasion to refer to the absurdity of attempting to prevent passengers from getting on and off where they please. There are few places where persons do not more or less frequently run some risks in their haste to get up or down. If such conduct is to have any force in compelling railways to conform their rules to it, it would require double platforms everywhere. But there was no evidence in this case that railroads usually or ever adopted such a course, or that it was safer or more prudent than the other. And as the general usages of this business are supposed to be matters of common knowledge, and have been so treated, we are not at liberty to make any such assumption, nor to allow it to be made without proof that the usages are changed.

The decisions are, so far as they have been brought to our attention, entirely uniform in requiring passengers to conform to the reasonable business arrangements of the railways. We have found no case in which a passenger has been upheld in neglecting to avail himself of the regular platform, unless he himself at the time was where it was not available, and was invited by the action of the company to go elsewhere. Where the train has been at the

platform and accessible there, it has been regarded as clearly indicating to the passenger what was expected of him.

This rule has been declared as well in those cases where a recovery has been had, as in those where it has been denied. It was laid down very forcibly in *McDonald v. Chicago & N. W. R. W. Co., 26 Iowa, 124,* where a passenger was injured by reason of the defective condition of the steps of the platform, and was going where a passenger had a right to go, and would go naturally. In *Foy v. London & Brighton R. W. Co., 18 C. B. (N. S.), 225,* a lady was invited to alight beyond the platform, by a porter of the company, and was held justified, the platform not being accessible. And in *Siner v. Gt. Western R. W. Co., L. R., 3 Exch., 150, affirmed in 4 Exch., 117,* where there was no such invitation, and a person jumped off without waiting or taking means to have the train backed to the platform, it was held there could be no recovery, and that passengers were bound to use common sense to avoid such risks. In *Cockle v. London and S. E. Ry. Co., L. R., 5 C. P., 457; 7 C. P., 321,* the platform receded at one end opposite which the car was from which the passenger got out, and it was dark there though light further on. The train had fully stopped, and it was held that the passenger had a right to suppose she should get out there. The *Siner* case was distinguished as not showing any good reason for getting out. In *Bridges v. N. London Railway Co., L. R., 6 Q. B., 377,* where a man who was familiar with the road jumped off in a tunnel a few feet back of the platform, it was held there could be no recovery. In that case the whole subject of the duties of companies and passengers in regard to conduct at stations was considered fully, and reference was made to the reckless habits of impatient travelers in their haste and disregard of the reasonable facilities furnished them. In *Toomey v. London & Brighton R. W. Co., 3 C. B. (N. S.), 146,* it was held a company having a proper platform could not be held guilty of any negligence, where a passenger after alighting undertook to open a door leading

down stairs, which was not intended for strangers, and about which he was misinformed by inquiring of a third person not connected with the road.    So in *Crafter v. Met'n Ry. Co., L. R., 1 C. P., 300,* where a man slipped on the brass edge of platform steps, the court said it was no negligence to have such steps, and that the company could not be dictated to as to the details of their buildings.

The only cases in this country which were cited as at all analogous to the present case, were *Hulbert v. N. Y. Central R. R. Co., 40 N. Y., 145;* and *Keating v. N. Y. Central and H. R. R. R. Co., 49 N. Y., 673.* In the former, a passenger who had been carried beyond Rochester by the neglect of the conductor to wake him as he had promised, was told to take the train westward at Newark, to return. The night was dark and it was late, the depot not lighted, and the train at a water station some hundreds of feet off. It did not appear that the train, which was an express, was to stop at Newark except to water, and there was nothing at the depot to indicate such an intention, and passengers were in the habit of boarding such trains at the water station.    The plaintiff on his way thither from the depot fell into an open pit which had once been a cattle guard. It was held there was evidence of negligence in keeping the pit open in that place, and it was a question for the jury.    In *Keating v. N. Y. C. & H. R. R. R. Co.,* the train stood away from the depot and across a street, where passengers were in the habit of getting on board, and the plaintiff was hurt by the sudden starting of the train without any signal or notice.    The case was decided on the ground that this had been treated by the company as a landing place, and the fact that they had conveniences at their depot, did not excuse them from neglect at other recognized stopping places, or necessarily put the plaintiff in fault for getting on there, and that the person in charge of the movement of the train having seen her approach under circumstances likely to induce a belief that she designed to get on, it was properly submitted to the jury

whether there was not negligence in starting without any examination whether she would be exposed to danger. But when the train is at the depot, where there are conveniences for passengers to get on and off the trains, it was very distinctly intimated it would be negligence to get on otherwise.

In the case of *Pennsylvania R. R. Co. v. Zebe, 37 P. St. R., 420*, it was held negligence to get off from the cars, away from the platform unless to escape peril, and that the fact that people did so frequently could not change the case, because they could not be controlled, and the company should not be held liable unless for its own neglect in not making proper provision for them. In those cases where the party has been invited to take a particular course by the persons in charge of the car or premises, the principles of agency apply, and he may act as they advise or direct.— *Warren v. Fitchburg R. R., 8 Allen, 227 ; Mulhado v. Brooklyn City R. R., 30 N. Y., 370.*

There can be no doubt of the right of passengers on board to have a reasonably sufficient time to get off, and of those presenting themselves to get on board, to have time sufficient for that purpose. The question presented here is whether the conductor (who represents the company) is at fault for not ascertaining whether passengers are waiting and attempting to come on board on the ground at the side away from the platform.

If the company perform their duty by furnishing such conveniences as are necessary at the depot, it is certainly contrary to reason and against the authorities to hold them further, unless a single platform is less than companies of ordinary prudence have found it advisable to prepare. But the usages of this kind of business are perhaps as well calculated as any thing else to show what course is prudent.

The advantages of railroad transportation are almost entirely composed of the elements of speed and security during the transit of the cars. Many trains pass and repass

daily, and are obliged to calculate that all other trains will adhere to the time-tables and conform to the orders from proper sources.  If each train should be compelled to keep constant watch and depend chiefly on that, there could be no night traveling possible.  Each conductor must have the responsibility of setting his train in motion, and it would be very perilous to allow him to depend on any thing but ·his own personal observation as to the safety of starting. He knows in advance what passengers are to alight at any station.  He cannot know what passengers are to go on board unless he has some place of observation where he can determine this.  He must be off from the cars to see in any direction who is coming and going, and to see that no time is needlessly wasted.  If he is compelled to keep watch on both sides of the train he can be no more sure when he gets back to the platform side that some one will not come up in a hurry on the other side, than he is by remaining on one side.  It would be very difficult, if not impossible, to devise any expedient whereby careless and tardy passengers can be looked after if they choose to incur perils. There are practical difficulties attending any such double vigilance which at night would be greatly aggravated.  The platform of every depot is usually sufficiently lighted to make the side beyond the cars considerably obscured by the shadows, and persons coming close to the cars at any point could not be readily distinguished, especially by eyes that have just come out of the light.  Passengers on the dark side will be far more likely to stumble and blunder. The necessity of prompt starting requires all of any one man's vigilance under the most convenient arrangements, as no one can tell whether persons near by are passengers or loungers until they attempt to get on board.  Any thing which would tend to distract the conductor's attention needlessly would tend as certainly to increase rather than diminish the risk of accidents.

It has never been the policy of the law to hamper bus-

iness needlessly, as such a course must always interfere with its general usefulness. The community who use business facilities must be expected to conform to all reasonable business usages. There is no usage more familiar than that relating to the construction and use of railroad depots and platforms. There is no traveler who does not know what they are made for, and who cannot see how much more convenient it is to use them than not to use them. Whatever may be allowable when the train is at another place, it is entirely reasonable to expect passengers who can use the platform just as well as not, to do so. And if they do not, they are certainly at fault for neglecting it.

In the present case the plaintiff showed by her own evidence that she arrived at the depot before the cars came in, and deliberately waited on the ground on the side of the cars most distant from the depot. If she had been on the other side there is no likelihood that the accident would have happened. She was not seen until it was too late to prevent it. She cannot be said to have been free from such negligence as contributed to the result, and any other conclusion would be at variance with her proofs, and the jury should have been so instructed.

The judgment must be reversed, and a new trial granted.

The other Justices concurred.