OSMER HULBERT, Administrator of JACOB HOLDEN, deceased, Respondent, v. THE NEW YORK CENTRAL RAILROAD COMPANY, Appellant.

The plaintiff's intestate was a passenger upon the cars of the defendant, from B. to R., by the train leaving B. for the east, in the evening. He had asked the conductor to awake him, if he should be asleep, when the train reached R. and the conductor had promised to do so. The train, however, arrived at and left the station at R., before the plaintiff's intestate awoke, and upon his then requesting the conductor to stop the train, the latter instructed him to go on to N., where, he informed him, that he would meet the train bound west, and could return in it to R. The train reached N. at 2 A. M., and stopped at the west water house, about 250 feet *west* of the station. The train, which the plaintiff's intestate was to take, was standing at a water house, about 200 feet *east* of the station. Upon the stopping of the train he was in, the plaintiff's intestate immediately got out, without inquiry as to whether it would proceed to the station there, and walked, between the tracks, towards the other train, with the intention of getting in. It was a very dark night, and there were no lights at the station house, none anywhere visible, except in the trains themselves, distant four or five hundred feet from each other. He passed by the station house, but made no inquiry whether the other train would stop there, after leaving the east water house. Immediately after passing the baggage car of this train, which he was going to enter, and just before he reached the first passenger car, he fell into an excavation, close to the track, where there had formerly been a cattle guard, and was seriously injured. It appeared that the station house was not kept open for that train, and that passengers at N. occasionally got on board of it at the water house, but whether, after leaving the water house, it always stopped

at the station house for passengers, when there were any, was a disputed point in the evidence. In an action brought to recover, by the plaintiff's intestate, for these injuries—*Held*, that it was a proper question for the jury, whether, under all the circumstances, he was guilty of negligence, in leaving the train, at the west water house, and attempting to reach the westward bound train, at the east water house, before either had arrived at the station, and without inquiry as to whether either would stop at the station, after leaving the water house. *Held* also, under the circumstances the jury were authorized to find, that it was negligence in the defendant to · leave the ground in so dangerous a condition, at the point where the plaintiff was injured, there being evidence that passengers from N. often got into this train, while standing at the water house, near the dangerous place.

Wherever passengers are accustomed to be received upon a train, whether at the station house, at the water tank, or elsewhere, railroad companies are bound to keep in a safe condition for transit, the ordinary space, in which passengers go to and from the train, and the latter have the right to assume, that the ground adjacent to the cars, within the limits in which persons necessarily and naturally go to and from them, admits of their getting safely out and in, even in a dark night.

*It seems*, that railroad companies are not justified in so locating their station houses for the landing and receiving of passengers, as to be within such immediate vicinity to cattle guards, however necessarily constructed, as to be unsafe for passengers. WOODRUFF, J.

(This cause was submitted on the 14th of January, 1869, and decided on the 20th day of March, 1869.)

THIS is an appeal from the judgment of the General Term of the Supreme Court, seventh judicial district, affirming a recovery below, by the plaintiff, for $5,000. The facts and the points urged upon the trial are fully stated, in the opinion of WOODRUFF, J.

*Edward Harris,* for the appellants.

*George E. Ripsom,* for the respondent.

WOODRUFF, J. The exceptions taken on the trial of this action, to which our attention is called, on the argument of the appeal, are the exception to the refusal of the court to order a nonsuit, and various exceptions to the judges' charge.

The original plaintiff, having taken passage in an east-going train, from Buffalo to Rochester, was carried past the Roches-

ter station, while asleep, he having the assurance of the defend-
ant's conductor that he would awake him at Rochester. The
plaintiff complaining and requesting the conductor to stop
the train, the latter told him he did not like to stop the train,
but if the plaintiff would go on to Newark, he could there
take the night express train, going west, and would get back
to Rochester as soon as he could then walk back, if the train
was stopped. The plaintiff consented. When the train
reached Newark, at about 2 o'clock in the night, it stopped
to take in water, at a water tank, about 245 feet west of the
Newark station house. At that moment, the night express,
bound west, had arrived at Newark, and was taking water at a
water tank, 174 feet east of the station house. Upon the stop-
ping of the train, the plaintiff left the car and walked over
the intervening distance, 419 feet, to enter the night express
train ; and after passing the engine and baggage car, when
opposite the first passenger car, about 280 feet east of the
station house, fell into an excavation, originally constructed
as a cattle guard, 66 feet west of a highway, but which had
been partly filled up. The plaintiff was seriously injured.
The night was dark, the ticket office was closed, and the plain-
tiff did not go to the office. He testified that there was no
light in the vicinity, except in the cars, and that he saw no
person, while walking from one train to the other.

I do not think that it can be said, that this conduct, on the
part of plaintiff, showed negligence in him, so conclusively that
the case should have been withdrawn from the jury ; or that he
was not entitled to be protected by due care, on the part of the
defendants, because he had no ticket, entitling him to be car-
ried back to Rochester. He was, in his purpose to return to
Rochester by the night express train, acting under the express
direction of the conductor of the defendants' train, that
brought him from Buffalo, and was induced to go to Newark
and forbear insisting upon being put off in the city of Roches-
ter, at a point east of the station, by the conductor's assurance
that he could return in that night express train. He, there-
fore, did not require a ticket, and the defendants, besides,

cannot object, that he had no ticket, if they were accustomed to receive passengers at that station, and by that train, and yet the ticket office was not kept open for the sale of tickets. Had it appeared that the defendants did not stop at Newark to deliver or receive passengers by those trains, and it was an accidental circumstance, that the conductor of the east-going train had given a person assurance of passage in the other, but the fact was wholly unknown to any other agent of the defendants, the question would be quite different.

Whether the plaintiff acted prudently, in leaving the train, and seeking the other, in the positions in which they stood, and attempting to reach the latter in the dark, without any guide but the lights in the cars, distant four or five hundred feet from him, I think was by no means free from doubt, and yet, I think, it was a question for the jury. When the train reached Newark, it stopped. The night was dark. It does not appear that he knew, or had reason to believe, that the train would stop again, or that it had not reached the point at which it was expected passengers for Newark would leave. If, when he reached the ground, he could see the station house, he saw that the distance to it was not greater than the length of a train of five or six cars, with the engine and tender, and probably not so great. At a less distance, to the east of the station house, he saw the lights in the cars of the other train, standing, and apparently waiting until that which he had left should pass, and he certainly did not know that that train would move forward, and then stop to receive him. Indeed, upon the whole evidence in the case, I think it very doubtful whether, if the accident had not happened, it would have done so. No other lights were around. He saw no persons from whom to seek direction.

It seems to me impossible to say, that his conduct was so unreasonable, or unnatural, or so unlike what is to be expected from men of ordinary care and prudence, under the circumstances, that the court should declare it negligence. The inclination of my own mind is rather the reverse. True, he has no cause of action, if there was no negligence on the part

of the defendants; but, on his part, he seems to me to have acted with ordinary care, and just as prudent men, having the same purpose and motive, would do, under the same circumstances.

Whether any negligence, on the part of the defendants, was proved, depends upon the rule or measure of duty, resting upon the defendants; and the exception to the refusal to non-suit the plaintiff, and some of the exceptions to the charge, present the same point for our consideration.

It is insisted, on behalf of the defendants:

1st. That they had a right, nay, that, by statute, it was their duty, to have and keep a cattle guard at the place of the accident, and, therefore, they are not in fault, whether the plaintiff was, or was not, careless.

2d. That the defendants are not bound to see to it, that their tracks, or the spaces between them, at points so remote as this was, from the station house, are in a safe condition to be passed over by persons, on foot, in the night, and in darkness; that such remote points are not adapted to, and are not intended to be traversed by their passengers, and the defendants are not guilty of any negligence, in not guarding against such accidents, or making such places safe for passing over.

As to the first of these points, I think the evidence showed, very clearly, what the judge charged, and, therefore, properly charged, viz.: That the excavation did not serve as a cattle guard, and could not be so regarded, and that, as a cattle guard, there was neither necessity, nor propriety, in permitting it to be at that place.

It was, according to the defendants' witnesses, 66 feet from the highway. Though originally constructed as a cattle guard, it had, in the changes made, in arranging the open space for the several tracks, the space in front of the station house, and the approaches thereto, been practically discontinued, for the purposes of a cattle guard, and had, in truth, been mainly, already, filled up, while the proof is, that it did not now serve the purposes of a cattle guard, since cattle could pass around it. No one can read the case, I think, without

the conviction, that the ground now taken on that subject is purely technical, that, in truth, there is no foundation, in either a purpose to keep it open, to keep out cattle, or in its capacity to accomplish such a purpose, for the claim, that it is a cattle guard, in law, or in fact.

But if this view were doubtful, I should still be of opinion, that, so far as any protection is sought, in the duty to maintain cattle guards, the defendants cannot excuse themselves, on that ground. The second question will still recur, whether the defendants were not bound to see to it, that the place, within reasonable distance, in the vicinity of the station house, is safe for the transit of passengers? I think, that if it be the duty of defendants to maintain a cattle guard at a given place, then it is their duty to locate their station house, or place for landing and receiving passengers, at a safe distance therefrom; or, if their convenience seems to them to require a nearer location, they are bound, by guards or warnings, lights or signals, to furnish passengers suitable protection.

It would be, obviously, most unreasonable to say, that because the statute makes it the duty of the defendants to maintain a cattle guard at a highway crossing, the defendants may locate their station, and land and receive passengers, in such vicinity thereto, as to endanger their lives or limbs, and omit all precautions for their safety, and justify themselves by saying, that because it is a cattle guard, they are under no responsibility, however probable it be, that passengers will fall into it. I think, therefore, the defendants gain nothing by calling the excavation, into which the plaintiff fell, a cattle guard.

The question then recurs, and, it seems to me, the substantial question, in this case, were the defendants guilty of negligence, in suffering this excavation to remain open within 280 feet of their station house, at the place where their trains were accustomed to stop, to receive wood and water?

The substance of the charge, in this respect, was, that if persons were accustomed to go where the cars were standing, and there get out and into the cars, then the space covered by

the cars, and the ordinary space in which persons go to and from the cars, the company are bound to keep in a safe condition. " Take any place where the cars are accustomed to stop, passengers have a right to suppose, that adjacent to the cars, the ground admits of their getting safely out and in, and I do not think that it is right to let any other rule prevail; *within the limits in which persons necessarily and ordinarily* go to and from the trains, it is necessary that the company keep the ground safe."

To this rule of duty there was no exception, and surely there could be none. Applied, as the instruction was, to a company receiving and landing passengers in the night, and in darkness, any less rule of care would be exposing passengers to imminent peril.

But, it was earnestly insisted, that this rule did not apply to a stoppage at the water tank, or wood station, but passengers must wait until the cars moved up to and in front of the passenger station, or ticket office.

As to this point, it is to be noticed, that there was a conflict of evidence, on the question, whether this night express train was accustomed to stop anywhere else, but at the water house. There was testimony, that after taking wood and water, it was accustomed to move directly on its way to the west, and that passengers, taking that train in the night, were in the habit of going to it, while standing for wood and water. This was, on the other hand, to some extent, denied, the conductor testifying, that he was in the habit of going to the station house, to ascertain, whether there were passengers there, going west, and, if he found any, the train was brought up in front of the station house, to receive them. Some of the servants of the defendants, by their testimony, leave a very distinct impression, that the passengers were wont to go to the train, and that the train rarely, if ever, stopped in front of the station house.

This testimony was very important, because it was insisted, not only that the duty of the company to keep the ground adjoining the track safe for transit, did not extend so far east

of the station house, but that the plaintiff had no right to be where he fell, and that it was negligence in him to be there.

Although some general observations were made by the judge, to the effect that passengers had a right to get on to a train, wherever it stopped, and, that wherever it stopped, the company was bound to keep the ground safe for transit, yet these observations must be understood with reference to the case on trial, and could not be understood to mean, that whenever a train, in its progress through the country, comes to a stand, for whatever purpose, or from whatever cause, passengers have a right to get in and out, and the ground along the track must be kept safe for that purpose. His meaning, however, was not left in any doubt, for, before the charge was finished, the judge was subjected to a searching cross-examination, pushed to a rare extreme, on behalf of the defendants, but which served the useful purpose of defining, with precision, the rule which was to be the guide to the jury, and, I think, obviated the previous exceptions.

Thus, the defendant requested an instruction to the jury: " That the defendant was not guilty of negligence, contributing to the injury, by reason of the hole being there, unless the vicinity of the hole was the *customary* place *provided* by *the defendant* for passengers to take the *night* express."

And the court responded to this request, by an instruction to the jury, that " if the train did not stop there *for the purpose* of receiving passengers, and passengers had no right to get in the train there, the *plaintiff* was wrong. But, if there was no definite place for passengers to get on board, and *passengers were accustomed* to get on board there, he was not negligent," and he left it to the jury to say whether this hole was in the vicinity of the place where passengers were so accustomed to get off and on the train. In various forms, the duty of the company to keep the passage safe, and the absence of negligence, of the defendant, was made in answer to the questions of counsel, to depend on the question, whether the defendants' passengers, to and from Newark, were accustomed to get out and into the cars, at that place, where the

night express was standing. And that question was left to the jury. And this, I think, in reference to a train arriving and departing in the night, and where, as I think, was manifestly the case, at the station, and at the time in question, passengers were left to grope their way, without the aid of light or guidance, was a rule of which the defendants cannot complain.

The claim of the defendants' counsel was, that the rule of duty was only applied to the place which the *defendants provided* for landing and receiving passengers.

If their servants and agents were accustomed to land and receive passengers at the train, while taking in wood and water, voluntarily and intentionally, then that was the place provided by the defendants. The mental operations of the directors, officers, or superintendent of the defendants fixing, or their words, declaring another place, in front of the station, cannot affect the passenger, if it is practically disregarded by the agents running the trains, or the usage and custom of receiving passengers below, is acquiesced in.

I am aware of the great difficulty of restraining the impatience of travelers, and that conductors will hardly be able to prevent passengers getting out of the cars wherever they stop. But, under such circumstances, as are shown in this case, when the getting on and off the trains, at the place where the train, on arriving at a village, takes wood and water, becomes the habit and custom, the defendants must be taken to know it, and if they acquiesce, without objection, it will create a duty to care for the safety of passengers, which would not otherwise exist.

Some passages in the charge, taken abstractly, and distinct from the immediate subject before the jury, and without the subsequent explanations, are, I think, liable to criticism; but the charge of the court is not to be reviewed in that manner. Looking at the whole charge, I do not think there was any error which calls for a reversal of the judgment.

I think, therefore, the judgment should be affirmed.

MURRAY, J., also read an opinion for affirmance, on the same grounds.

All the judges were for affirmance, except LOTT, J., who did not vote. ·

Judgment affirmed.

NOTE.—The judgment in this case is not entirely in harmony with the reasoning of the majority of the court, in *Stiner* v. *Great Western Railway Co.* (Law Rep., 3 Exch., 150), decided May 1st, 1868. In that case, stress was laid upon the fact, that the passenger had received no invitation or direction to get out at the point where she was injured, and it was said, that if it was a dangerous or unfit place to descend, it was her duty to request the company's servants to back to the station. (But see *Wilkinson* v. *Fairie*, 1 Hurlst. & Colt., 633; *Foy* v. *London Br. and South Coast Railway*, 18 C. B. N. S., 225.)—[*Rep.*]