## Illinois Central Railroad Company v. Mary Keegan.

### Gen. No. 11,117.

1. ORDINARY CARE—*what is.* The term "ordinary care" does not express distinctly any certain degree of care; what is ordinary care depends upon the circumstances of each particular case, so that ordinary care under one set of circumstances might be positive negligence under other circumstances.

2. SNOW AND ICE—*duty of railroad to clear depot steps of.* It is a question for the jury to determine whether a railroad company has been guilty of a want of ordinary care in failing to keep the steps leading to its depot clear of ice and snow.

3. CONTRIBUTORY NEGLIGENCE—*when question of, as one of law, has been waived.* Where the defendant in a personal injury case has moved for a peremptory instruction upon the ground that the plaintiff, as a matter of law, had been guilty of contributory negligence, and after such motion has been overruled, causes the court to instruct the jury upon the question of contributory negligence as one of fact, he thereby waives any error in refusing the peremptory instruction upon such ground.

4. CONTRIBUTORY NEGLIGENCE—*what not. Held,* in this case, that one passing down steps leading to a railroad station which are covered with snow and ice, is not, as a matter of law, guilty of contributory negligence in failing to take hold of the railing running alongside of such steps.

Action on the case for personal injuries.    Appeal from the Superior Court of Cook County; the Hon. Jonas Hutchinson, Judge, presiding. Heard in this court at the March term, 1903.    Affirmed.    Opinion filed January 25, 1904.

W. A. Howett, for appellant; J. G. Drennan, of counsel.

O'Brien & McKinley, for appellee.

Mr. Presiding Justice Adams delivered the opinion of the court.

Appellee was injured by falling on certain steps adjoining a station of appellant, up and down which persons had to pass in going to or leaving the station.    She claims that her fall was occasioned by appellant's negligence in failing to exercise proper care of the steps.    The accident occurred January 26, 1901, about 1:15 o'clock P. M.

It is averred in the declaration, in substance, that the defendant permitted its steps, leading to its depot, to be and remain covered with snow and ice, and so slippery as to be dangerous, although defendant knew of said danger, and had reasonable time in which to have rendered said steps safe, prior to the happening of the accident.    By reason of the premises, the plaintiff, intending to become a passenger on one of defendant's trains, and while necessarily passing over said steps, in the exercise of ordinary care, unavoidably slipped on said ice and snow there accumulated, and was thereby thrown with great force and violence to and upon the steps and ground.

Appellant pleaded the general issue.    The jury found for appellee and assessed her damages at the sum of $3,000, for which sum judgment was rendered.

Appellant's right of way in the city of Chicago lies north and south on the west shore of Lake Michigan.    It has a depot about where Thirty-first street, which is an east and west street, would, if extended easterly, intersect the right cf way.    The north and south street next west of the right of way is Lake Park avenue.    West of the appellant's right of way is a stone wall, and running down from the south, and parallel with the wall, and east of it, is a flight of stone

steps. The steps are thus described by a witness, a civil engineer, who made measurements of them :

"There are thirteen steps; the tread of the widest one is fourteen and one-half inches, the narrowest one eleven and one-half inches; the risers average about six and one-half inches; that is the height from the tread of one to the tread of another. The total horizontal distance from the top of the steps to the bottom is thirteen feet ten inches, and the total depth from the top of the first step down to the bottom is about six feet nine inches. I made measurements of each step and they are almost exactly alike. The top one is the narrowest and it is eleven and one-half inches at the ends. There is practically no difference in the risers. The width of the steps or the distance from the wall to the railing was nine feet six inches at the top, and eight feet six inches at the bottom. On the west or street side there is a stone wall, and on the east side an iron railing. It is a fence made of iron pickets about an inch square and probably about five feet high. The distance from the bottom of the steps to the ticket office is five feet eleven inches. The curb from the street to the sidewalk is six and one-half inches—that is from the asphalt street up to the curb; that is out on the street."

On the east side of the stone steps there was an iron hand-rail extending from the top to the bottom of the steps. There was no canopy or covering over the steps, the city having refused to permit such. Persons going to the station in question to take appellant's suburban trains, or leaving its trains at that station, had to pass over the stone steps, there being no other way to go to the station, or to return from it to Lake Park avenue. It was admitted by counsel for appellant that 600 persons passed over the steps daily, and Mrs. Vallo, appellant's ticket agent at the station, testified that 500 persons, on an average, passed down the steps to take suburban trains every forenoon.

Henry J. Cox, a witness for plaintiff, testified, substantially, that he has charge of the United States Weather Bureau in Chicago, and keeps a record of all weather con-

ditions, such as temperature, rainfall, snowfall, etc., and that he has the record of the condition of the weather in the city of Chicago on January 26, 1901. Snow on that day began some time before daybreak and ended thirty-seven minutes after two; there was three and one-tenth inches of snowfall; the highest temperature was thirty and the lowest, twenty-three; thirty-two Fahrenheit is the freezing point. On that day it was not warmer than freezing point. On the 25th of January, the day before, it was generally cloudy with some light snow flurry early in the morning, and began at nine o'clock in the morning and ended at 3:30. The temperature was from twenty-five to thirteen. At no time that day was there temperature which would permit thawing. On the 24th of January there were light snow flurries practically all day from 5:45 in the morning until five minutes after five in the afternoon. Just a trace of snow; partly cloudy; temperature from thirty-six to thirteen. On that day the temperature permitted thawing. On the 26th the winds were fresh southerly and southwesterly. These observations were made at the Auditorium tower in Chicago, and the conditions would be practically the same at Thirty-first street. On the 24th of January there was a light flurry of snow, beginning at about 5:45 A. M. and continuing until 5:05 P. M. On the night of the 24–25th a flurry of snow began during the night and ended about 3:30 P. M. on the 26th. The snow began during the night before and fell continually during the daylight hours of January 26th until 2:37 P. M.

Other witnesses testified as to the weather, but there is no substantial conflict between their testimony and that of the witness Cox. The condition of the steps is described by the appellee's witness substantially as follows:

William H. Sherwood: "There was some ice on the steps, I should judge from the sensation walking down, and slush with it and snow. I should imagine there might have been from one and a half to two inches of ice and snow."

Q. "How do you know there was ice there?" "A. "Merely by the feeling. It was somewhat packed down,

more or less. Not regular hard ice; not as hard as ice alone would be. I would describe it as slush." On cross-examination this witness testified: "The weather was close to freezing, because there was both slush and some harder material under foot, ice or packed snow. The condition was the same in the street, on Lake Park avenue, and I have a dim impression that there was, at that time, on Lake Park avenue, from two to six inches of snow. There was a condition of slush generally on the street, slush and ice under it. I noticed places on the steps where it was packed down, apparently by footsteps or ice formed, I think both." This witness was on his way to take a suburban train, and saw appellee at the foot of the steps immediately after her fall, and tried to help her toward the station.

John Hughes, a police officer, who went to the station with an ambulance, in company with White, another police officer, and the driver, Jones, to assist appellee and take her away, testified that he and White walked down the steps, and that they were very slippery; that there were snow and ice on them—might have been two or three inches—more in some places than others, as in some places it was a little lumpy; that there might have been an inch and a half of ice, with snow on top. On cross-examination this witness said: "There was some slush and snow, from two to three inches, I should judge, in some places, and there was some ice under it. I didn't see the ice, only felt it." Jones, the ambulance driver, testified that he stayed on the ambulance by the side of the steps, and that the steps seemed to be very slippery with snow, and kind of rough.

White, the officer who went with the ambulance in company with Hughes, testified that there seemed to be a couple of inches of snow on the steps, with ice underneath; that it was kind of slippery where the tracks of feet were; that he couldn't say how much ice there was, but that it was pretty slippery. On cross-examination he said that there was slush in some places and snow and ice in others. Daniel F. McCarthy, a policeman whose beat included the place in question, testified that he was at the steps in the forenoon

of January 26, 1901, between nine and ten o'clock; that there were ice and snow on the steps; that when he first saw the steps, it was kind of slushy, he should judge two or three inches in some parts, and in other parts none; that it seemed to be banked up from the back to the front of the step, and that was the slipperiest part of it. On cross-examination he testified that the steps had the appearance of having been trampled hard, and of there being an icy substance under the snow; that there was ice under the slush; that he did not merely think so, but was positive; that he slipped on it; that he noticed the steps particularly.

Mrs. Frank Wing, a sister-in-law of appellee, who lived in the apartment building where appellee was visiting at the time, testified that she went to the station to take appellee home, and went down the steps; that there were, she thought, a couple of inches of ice on the steps, and that it was jagged in places and distributed around on the steps; that she felt the ice under her feet, and saw it. On cross-examination she testified that the steps were jagged and rough where the ice was; that there were two or three inches of snow on the steps, and a few inches of ice where the snow had blown; that her recollection was that there were about five inches of snow and ice together on the steps.

Mary Keegan, the appellee, testified that January 26, 1901, she was going to the station in question to take the train for Woodlawn, and, when she arrived at Thirty-first street she started to go down the steps; that she saw they were very icy, and was very careful; that she slipped on the first step, and her feet went from under her, and she fell all the way down the steps, and that is all she could remember.

There is no direct evidence on the part of the appellant as to the actual condition of the steps, in respect to ice, at the time of the accident. Appellant's evidence as to the steps was mainly directed to the care which it took of them, which evidence is, in substance, as follows: Lou Calton testified that January 26, 1901, he was employed under

foreman Charles Clancy as a sweeper for appellant; that, during the forenoon of that day he was sweeping the elevated platform between the suburban tracks, which is about forty feet long by six feet wide; that he worked that day from seven o'clock in the morning till 12:30 o'clock P. M., when he went to dinner, and that he didn't see the steps before the accident; that there was another sweeper that day, Boyle, who had charge of cleaning the stone steps and the platform, and that he saw Boyle in front of the station sweeping the platform; that he, Boyle, would come there regularly every thirty minutes; that Boyle used a common sweeping broom in sweeping off the snow in front of the station; that Clancy did nothing except to carry salt and put it on the steps; that witness did not see him put salt on the steps, but saw him have a bottle of salt. Boyle, whose evidence is in the form of a deposition, testified that his age was seventy years, and that January 26, 1901, he was employed by appellant as a sweeper, and that day had been sweeping the snow from the steps and platform; that Clancy, his foreman, gave him instructions to throw salt on the steps and sweep the snow off, which he had been doing for some time; that he swept off the snow a number of times, how many he could not say; that, at the time of the accident, he was in front of the depot sweeping, and had swept the snow off the steps about three-quarters of an hour before the accident, and had put salt on them about 12:30 o'clock, before he went to dinner; that he got back from dinner about 1:15 o'clock, and observed the steps, and could see that there was about one-fourth or one-half inch of snow on them, and could see part of the steps through the snow. On cross-examination he testified that between 12 and 1:30 o'clock he only used the broom in cleaning the steps, and to his knowledge no one used any instrument to remove ice or frozen snow from the steps; that the broom and shovel were the only things used to remove snow from the steps, and that salt was put on the steps to melt the snow and keep the stone from freezing.

Mrs. Vallo, appellant's ticket agent, testified that the

ticket office faced the steps, and there were two windows in it, which gave her a view of the entire steps from where she sat; that on the day in question there were two men sweeping there, and later on two more, and they were cleaning around there all day; that she saw Clancy clean off the steps four times in the forenoon, and saw a man named Jackson clean them off, perhaps three times, and also saw salt put on the steps; that day four times before one o'clock.

There was no eye witness of the accident except appellee. The only evidence as to care on her part is her own. She testified that she saw the steps were icy and slippery, and was going down very carefully, and knew there was a railing there, but did not take hold of it. Three witnesses for appellee, Hughes and White, the policemen, and Mrs. Wing, appellee's sister-in-law, testified that they took hold of the hand-rail in going down the steps. Hughes testified that he saw the steps were very slippery, and went to the side and took hold of the hand-railing; that he exercised greater precaution in going down the steps, because they were slippery. Mrs. Wing testified that she saw the ice, and went over to the east side and took hold of the railing.

Appellant's counsel contend that appellee was not a passenger, and, therefore, appellant's sole duty to her was to exercise ordinary care to keep the steps in a reasonably safe condition for persons passing over them. Counsel cite numerous cases to the effect that a municipal corporation, notwithstanding its duty is to exercise ordinary care to keep the streets under its control in a reasonably safe condition for public travel, is nevertheless not liable for accidents occurring on account of the mere slippery condition of a street, occasioned by ice or snow not amounting to an obstruction, and conclude that appellant, being liable in the present case only for the non-exercise of ordinary care, is not liable for the mere slipperiness of the steps, there being no evidence that ice or snow, or both together, on the steps, constituted an obstruction. The argument concisely stated is: a city whose sole duty, as to the streets, is to exercise ordinary care, is not liable for slipperiness

unaccompanied by obstruction; therefore appellant, whose sole duty to persons using the steps is to exercise ordinary care, is not liable for mere slipperiness unaccompanied by obstruction. The argument ignores the consideration that the words "ordinary care" do not express definitely any certain degree of care; that what is ordinary care depends on the circumstances, so that what would be ordinary care in one set of circumstances might be positive negligence under other circumstances. "The term 'ordinary care,' when used in a general sense, without reference to the facts of any particular case, comes nearer expressing, perhaps, a definite measure of responsibility than the expression 'due care,' yet the degree of diligence which it implies greatly varies, according to the character of the circumstances to which it relates." Schmidt v. Sinnot, 103 Ill. 165, 166. The argument also assumes that the duty which the city owes to the public in respect to the public streets, when covered with ice and snow, and appellant's duty in respect to the steps in question, and the degree of care which each must exercise, are the same.

Appellee's counsel, in their argument, remark, pertinently, as we think: "It would be unreasonable to expect municipal authorities to be able, in a few days, to remove a general fall of snow or an accumulation of ice or sleet from all of its streets or walks; but it is not unreasonable to require a railway company, in the same time, to remove snow and ice from its station steps, over which it induces, or in fact compels patrons to pass, in their efforts to become passengers for hire on its trains."

The stone steps in question are on the east side of Lake Park avenue, a public street of the city, are under the apparently exclusive control of appellant, and presumably were constructed by it, with the city's consent. A very large number of persons daily pass over these steps in going to and returning from appellant's trains, and must do so, if they take trains or leave them at the Thirty-first street station. Appellant has virtually said to the public: if you wish to leave or take my trains at Thirty-first

street, you must do so by the stone steps adjoining the station. Under such circumstances, and the other circumstances shown by the evidence, it would seem that ordinary care in such case must be held to be a greater degree of care than that incumbent on a municipality as to snow and ice on its streets. In New York the law as to the care imposed on a city, in respect to snow and ice on its streets, is the same as in this state. Kinney v. City of Troy, 108 N. Y. 567. Nevertheless, it has been held in that state that railroad companies must exercise greater care in that respect than that incumbent on cities. Weston v. N. Y. El. R. R. Co., 73 N. Y. 595, was an action to recover damages for injuries sustained by falling on an uncovered platform, on defendant's road, over which it was necessary for passengers to pass to reach the cars, and which the defendant had permitted to become covered with snow and ice. The trial court charged the jury "that the defendant was bound to be on the alert during cold weather, and to see whether there was ice on the platform, and to remove or make it safe, by sanding it or putting ashes upon it, or in some other manner." *Held*, "that the rule stated by the court, as applied to the case, was proper, and not too stringent; and that the evidence justified the submission to the jury of the questions of negligence and contributory negligence; that the condition of the platform was, at all times, within the notice of the defendant and its servants, and there was no difficulty in making it safe." See, also, Hulbert v. N. Y. Cen. R. R. Co., 40 N. Y. 145. In that case the passenger on his way from the train, in a dark night, fell into an excavation. The trial court charged the jury, among other things, as follows: " Take any place where the cars are accustomed to stop, passengers have a right to suppose that adjacent to the cars, the ground admits of their safely getting out and in, and I do not think that it is right to let any other rule prevail within the limits in which persons necessarily and ordinarily go to and from the trains; it is necessary that the company keep the ground safe." The court, on appeal, approved this charge.

See, also, Ry. Companies v. Treadway, 143 Ind. 689, 697; Tahn v. Portland R. R. Co., 59 Me. 183; T. W. & W. Ry. Co. v. Grush, 67 Ill. 262.

We are of opinion that the question, whether the appellant was negligent, as charged in the declaration, was properly submitted to the jury, and that the verdict, in so finding, is not manifestly against the weight of the evidence. Appellant's counsel further contend that appellee, in not taking hold of the hand-rail when she attempted to pass down the steps, although she saw, as she testified, that the steps were icy, was guilty, as matter of law, of contributory negligence which precludes a recovery. Counsel for appellant, at the close of the evidence for appellee, and also at the close of all the evidence, asked the court to instruct the jury to find for the defendant, and presented, to be given, instructions to that effect, which the court refused to give. But appellant's counsel subsequently asked, and the court gave this instruction: "The jury are instructed, even if you believe from the evidence that there was some ice or snow or both upon the steps in question, still if you further believe from the evidence that such ice or snow was plainly visible to the plaintiff, then the law required her to exercise a degree of care in descending such steps commensurate with the danger, if any, caused by such ice or snow. And if you believe from the evidence she did not exercise such care as is defined in other instructions given you herein, you should find for the defendant."

In Chicago Terminal R. R. Co. v. Schmelling, 197 Ill. 619, the railroad company contended, on appeal, that the plaintiff in the action was guilty of negligence, as matter of law, in alighting from the defendant's railroad car while it was in motion. The court say: "The plaintiff in error asked and the court gave, in its behalf, an instruction to the following effect: 'If the jury believe from the evidence that the plaintiff left the car of the defendant Chicago Terminal Transfer Railroad Company while the same was in motion, and if they further believe from the evidence that he knew of the proximity of the tracks of

the Chicago, Burlington and Quincy Railroad Company, they may take these facts into consideration in determining whether plaintiff was exercising due care and caution for his own safety.' Inasmuch as the plaintiff in error asked and the court gave an instruction which left it to the jury to take into consideration the fact, if it was a fact, that the defendant in error alighted from the train while it was in motion, in determining whether he was in the exercise of due care and caution for his own safety, it cannot be urged now and here by the plaintiff in error, that such fact was negligence *per se*, or negligence as matter of law." Ib. 625.

In view of this decision, appellant, by requesting the instruction first above quoted, and which the court gave, is precluded from urging here that appellee was guilty of contributory negligence, as matter of law. Even though appellant were not so precluded, the writer would hesitate to hold that appellee was guilty of contributory negligence in omitting to take hold of the hand-rail before putting her foot on the first step, on which she slipped. She was hastening to the station to take a train, and in the short space of time, before she stepped on the top step, although she perceived the steps were icy, she may not have observed that the slush was, as testified by McCarthy, banked up "from the back of the step to the front of the step," and may not have appreciated the danger. It seems to the writer that, under such circumstances, men of reasonable minds might reasonably differ as to whether appellee was guilty of contributory negligence. It is true that three of appellee's witnesses testified that, in passing down the steps, they took hold of the hand-rail, but they did not testify at what place in their descent they did so, and they were apprised of the accident before attempting to go down the steps. Daniel F. McCarthy, witness for appellee, testified that about ten o'clock in the morning of the day of the accident, he went down the steps to the station, and saw the lady who was generally down there; also that in cold weather he used to go down there to warm up. In the

40      APPELLATE COURTS OF ILLINOIS.

VOL. 112.] Nat. Council Knights & Ladies of Security v. O'Brien.

examination of Mrs. Vallo, the ticket agent, the following, and other like questions, were asked her: Q. "What, if any, policeman was there, that came down these steps, at any time that forenoon, but who didn't take passage on the trains?" The court excluded this question, and also a question as to whether McCarthy was in the habit of coming to the station to warm himself. Q. "What, if any, policeman in uniform was there that came down to your station that day to warm himself?" To which the witness answered that she did not remember of any policeman being down there. If there was any error in excluding the other questions, the answer to the last question cured it. It is manifest too that the witness, in attending to her duties as ticket agent, could not and did not observe all persons who passed down the steps. Hughes and White, policemen, went down the steps to assist appellee, yet Mrs. Vallo says she did not notice any policemen down there.

Counsel for appellant complain of the refusal of one instruction. We think the instruction faulty, and that it was properly refused. It is not contended by appellant's counsel, in their argument, that the sum assessed as damages is excessive. The judgment will be affirmed.

*Affirmed.*